191 F.3d 140 (2nd Cir. 1999)
 WILLIAM ARAMONY, Plaintiff-Counter-Defendant-Appellee-Cross-Appellant,
v
UNITED WAY REPLACEMENT BENEFIT PLAN, UNITED WAY SUPPLEMENTAL BENEFITS AGREEMENT, Defendants-Counter-Claimants,
UNITED WAY OF AMERICA, Individually and as administrator and named fiduciary under the United Way of America Replacement Benefit Plan, and as administrator of the United Way Supplemental Benefits Agreement, Defendant-Counter-Claimant-Appellant-Cross-Appellee.
 Docket Nos. 98-9502 (L), 98-9672 (Cross-Appeal)
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: June 7, 1999
Decided: September 02, 1999
 
 Appeal from a judgment of the United States District Court for the Southern District of New York (Scheindlin, J.), rendered following a bench trial of William Aramony's ERISA claims and United Way of America's breach of contract and fiduciary duty counterclaims. United Way contends that the district court erred by granting Aramony's claim of entitlement to benefits under a United Way Replacement Benefit Plan, finding that this plan compensated Aramony for the effect of I.R.C. §401(a)(17) on those benefits, and limiting United Way's recovery on its breach of fiduciary duty counterclaim. Aramony cross-appeals, arguing that the district court erred by rejecting his claim of entitlement to benefits under United Way's Supplemental Benefits Agreement and by limiting his recovery of attorneys' fees.
 Affirmed in part, reversed in part, and remanded. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 MICHAEL BAILEY, New York, NY (Dennis W. Houdek, Falcone, Houdek, Bailey & Curd, LLP, on the brief), for Plaintiff-Counter-Defendant-Appellee-Cross-Appellant.
 PAUL J. ONDRASIK, JR., Washington, DC (Sara E. Hauptfuehrer, Steptoe & Johnson LLP, on the brief), for Defendant-Counter-Claimant-Appellant-Cross-Appellees.
 Before: WINTER, Chief Judge, OAKES, and SACK, Circuit Judges.
 SACK, Circuit Judge:
 
 
 1
 For twenty-two years, William Aramony served as president and chief executive officer of United Way of America, one of the nation's premier charitable organizations. But in 1992 he was fired amidst a rising tide of allegations that he had engaged in fraud and financial improprieties with respect to United Way funds. Subsequently, Aramony was convicted in the United States District Court for the Eastern District of Virginia on numerous felony counts of fraud, and sentenced to seven years' imprisonment. In light of these events, United Way determined to deny Aramony an array of pension benefits. Aramony filed suit to regain the benefits, and United Way counterclaimed to recover for, inter alia, Aramony's breach of fiduciary duty. After a five-day bench trial, both sides prevailed in significant part, and both now appeal.
 
 BACKGROUND
 
 2
 The background of this case is described in detail in the district court's opinion, Aramony v. United Way of Am., 28 F. Supp. 2d 147, 153-66 (S.D.N.Y. 1998). We restate it only insofar as necessary to explain our disposition of this appeal.
 
 
 3
 United Way of America, a not-for-profit New York corporation, organizes and provides services to local chapters engaged in a variety of charitable pursuits nationwide. United Way's activities are primarily funded by dues paid to it by these locals, calculated as a fixed percentage of the charitable contributions each receives. The affairs of United Way are overseen by a Board of Governors, but its day-to-day operations are controlled by its president and CEO, a post held by William Aramony from 1970 until his resignation under fire in 1992. A subcommittee of the board known as the Executive Committee is empowered to adopt pension plans and compensation agreements on United Way's behalf.
 
 I. United Way's Pension Plans
 
 4
 United Way provides its employees with a qualified defined benefit plan under which pension benefits are calculated as a function of an employee's average salary over a five-year period, multiplied by a fixed ratio, and multiplied again by the employee's years of service. Pursuant to I.R.C. § 415, however, there is a maximum benefit an employee may receive pursuant to this plan in the neighborhood of $100,000 per annum $90,000 upwardly adjusted for cost of living increases. See 26 U.S.C. §415(b)(1).
 
 
 5
 On February 27, 1984, the Executive Committee met to consider adopting a non-qualified pension plan ("Replacement Benefit Plan" or "RBP") that would provide those highly compensated employees subject to the § 415 limitation, including Aramony, with benefits offsetting the impact of § 415 and certain other tax-code limitations on the qualified defined benefit plan. United Way's usual practice when considering pension plan proposals was for the Executive Committee to approve the concept of the plan, leaving the details to be worked out between United Way employees specializing in employee benefits, such as senior vice president and CFO Stephen Paulachak, and United Way's insurer, Mutual of America Life Insurance Co. The adoption of the RBP proceeded along these lines.
 
 
 6
 At the February 27 meeting, Paulachak distributed an agenda setting forth the basic principles of a proposed RBP. Aside from indicating the purpose of the proposed plan, the agenda did not refer to specific details, although it did recommend that the Executive Committee "authorize United Way... to establish a Replacement Benefit Plan . . . as outlined under [the attached draft plan]."
 
 
 7
 The referenced attachment was a partially incomplete sample RBP document, i.e., the document left blank significant terms such as its effective date and controlling law, offered but did not select from among various options for determining eligibility and benefit amounts, and did not contain a signature or signature line. This draft plan did, however, include two specific provisions of note. First, it contained a benefit calculation formula provision based on United Way's qualified defined benefit plan. Second, it contained a felony forfeiture provision stating:
 
 
 8
 The right to the payment of any amount provided under this Plan shall be subject to forfeiture upon the commission of a prohibited act by the Participant. A prohibited act shall be the commission of a fraud, embezzlement or other felony involving the Employer for which the Participant has been convicted in a Court of competent jurisdiction.
 
 
 9
 The draft plan went on to state, however, that "[e]xcept as may be provided in [the felony forfeiture provision], the Participant's rights under this Plan shall become nonforfeitable upon termination of employment."
 
 
 10
 The Executive Committee accepted the recommendation reflected on the agenda and authorized the establishment of an RBP, expecting Paulachak to work out the specific details of the plan in conjunction with Mutual. Accordingly, Paulachak relayed the Executive Committee's decision to Mutual, asking it to create the plan document embodying the RBP. About one year later the time lapse unaccounted for in the record Mutual produced a final document. On May 16, 1985, Paulachak signed it on United Way's behalf.
 
 
 11
 There are two significant differences between the plan produced by Mutual and signed by Paulachak (the "signed plan") and the draft plan that had been attached to the agenda at the February 1984 board meeting (the "draft plan"). First, whereas the draft plan's benefit-calculation formula referred to and depended upon United Way's qualified defined benefit plan, the signed plan's benefit-calculation formula referred to and depended upon a qualified defined contribution plan. United Way did not have a defined contribution plan. Second, the signed plan did not contain the felony forfeiture clause contained in the draft plan, providing instead only that benefits become nonforfeitable upon termination of employment.
 
 
 12
 In addition to providing Aramony benefits under the RBP, in October 1984 United Way entered into yet another compensation arrangement with Aramony, the Supplemental Benefits Agreement ("SBA"). In the SBA, United Way agreed to give Aramony an additional retirement benefit equal to the balance on a hypothetical account to which United Way would "contribute" $2,083.33 per month until Aramony's retirement, plus interest at United Way's option. In contrast to both versions of the RBP, the SBA was silent on the question of forfeiture.
 
 II. Aramony's Misconduct
 
 13
 From at least as early as September 1982 onward, Aramony engaged in a pattern of financial misconduct and fraud at the expense not only of United Way and its local chapters, but also of those charity-giving members of the general public whose trust he thereby betrayed. During this period, Aramony routinely billed United Way for an array of unauthorized personal expenses, including personal air travel, car rentals, hotels, and meals. Aramony also regularly falsified expense reports throughout this period in an effort to conceal his wrongdoing, at times directing other United Way employees to assist him in doing so.[1]
 
 
 14
 In late 1991, United Way learned that members of the press were looking into a possible story about United Way including, inter alia, allegations of wrongdoing by Aramony and another United Way officer. United Way responded by retaining the services of investigators at The Investigative Group, Inc. ("IGI") and of the public relations firm Hill & Knowlton. Later, United Way hired the law firm Verner, Liipfert, Bernhard, McPherson, and Hand ("Verner Liipfert") to assist and expand IGI's investigation, and the accounting firm Coopers & Lybrand to perform various audits in connection with the investigation.
 
 
 15
 In February 1992, IGI and Verner Liipfert's investigation began to focus on Aramony's misconduct. At the same time, reports of the allegations of Aramony's misconduct began to appear in the media. Eventually, United Way forced Aramony out.[2]
 
 III. The Pension Benefits Litigation
 
 16
 As a consequence of Aramony's misconduct, United Way determined to deny him pension benefits under both the RBP and the SBA. Aramony responded by filing this lawsuit, in which he claimed among other things that he is entitled to benefits under the RBP and SBA pursuant to §502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B) (providing a civil action to recover benefits due under certain employee benefit plans). Aramony also sought a declaratory judgment pursuant to 28 U.S.C. §2201 as to the scope of the benefits to which he is entitled under these plans. United Way counterclaimed arguing among other things that Aramony had breached his fiduciary duty to the organization and should therefore forfeit certain pension benefits and return other compensation already paid to him.
 
 
 17
 After conducting a five-day bench trial, the district court, in a lengthy, thoughtful, and meticulous opinion, issued a split decision. The court determined that, despite his felony conviction, Aramony was entitled to benefits under the RBP. This conclusion followed from the court's determination that the signed plan rather than the draft plan controlled. The signed plan unlike the draft plan contained no felony forfeiture provision, providing to the contrary that rights under the RBP become nonforfeitable upon termination of employment. See Aramony, 28 F. Supp. 2d at 166-68. The court also determined, applying principles of promissory estoppel, that the RBP included a benefit offsetting the impact of I.R.C. §401(a)(17), a tax- code provision enacted subsequent to the adoption of the RBP that otherwise would have the effect of limiting the amount of § 415 make-up benefits available to highly compensated individuals such as Aramony under the RBP, even though that benefit was never formally included in the RBP. Seeid. at 168 71.
 
 
 18
 On the other hand, the district court rejected Aramony's claim that he was entitled to benefits under the SBA. The court reasoned that the federal common law of forfeiture was applicable to that agreement because the agreement was silent as to forfeitability. Aramony's disloyalty throughout the period the SBA was in force therefore precluded him from receiving benefits under that agreement. See id. at 171. The court also rejected Aramony's request for attorneys' fees. See id. at 174-75.
 
 
 19
 Addressing United Way's counterclaims, the district court had little trouble concluding that Aramony was liable to United Way for, among other things, breach of his common-law fiduciary duty. Seeid. at 175-76. The court determined, first, that as a result of this breach Aramony was obligated to disgorge the $951,250 in salary paid to him during the limitations period applicable to this claim. The court then considered United Way's claims of consequential damages, concluding that it was entitled to recover for any injuries as to which Aramony's misconduct was a "substantial factor." See id. at 177 (citing Milbank, Tweed, Hadley & McCloy v. Boon, 13 F.3d 537, 543 (2d Cir. 1994)). Applying this standard, the court awarded consequential damages of: (1) $65,400 out of a requested $1,586,695 in legal fees paid to Verner Liipfert; (2) $20,000 out of a requested $217,390 in legal fees paid to Weil, Gotshal and Manges, which United Way had retained to provide counsel to its board members; (3) $62,000 out of a requested $140,426 in investigative fees paid to IGI; (4) $75,000 out of a requested $373,653 in accounting fees paid to Coopers & Lybrand; (5) $4,950 paid to the public relations firm Smith & Haroff which United Way had hired to provide media training to its senior officials; and (6) $4,788 expended on the production and distribution of a videotape explaining United Way's position on Aramony's misconduct. See id. at 179-81. The court permitted no recovery, however, on United Way's claims for: (1) public relations fees paid to Hill & Knowlton in connection with efforts to deal with the initial media reports concerning possible wrongdoing at United Way; (2) costs associated with locating a new president; (3) various travel expenses; (4) decreases in dues revenue received by United Way from its local chapters in 1992, 1993, and 1994; and (5) costs related to the decrease in dues, such as the cancellation of a 1992 conference, the interest costs incurred by United Way when it was compelled to borrow funds to meet payroll obligations in 1992 and 1993, and the costs associated with instituting an early-retirement program that had to be adopted in the wake of the reduction in dues. See id. at 177-81. The district court determined also that United Way was entitled to punitive damages in the amount of $50,000. See id. at 182-84.
 
 
 20
 Ultimately, the court awarded to Aramony $3,221,057 under the RBP, plus an additional $1,177,121.39 in prejudgment interest. See id. at 184. The court awarded to United Way a total of $1,233,388 in actual, consequential, and punitive damages, plus an additional $788,555.92 in prejudgment interest. See id. at 185. Both parties appeal.
 
 DISCUSSION
 
 21
 United Way's appeal presents three issues. First, United Way contends that the district court erred by concluding that Aramony is entitled to receive pension benefits under the RBP because: (a) the court should have treated the draft rather than the signed plan as effective and the plan's benefits therefore unavailable to Aramony under the draft's felony forfeiture clause, and (b) even if it was the signed plan that was effective, the court should have interpreted it either as providing no benefits at all or as implicitly containing the forfeiture provision. Second, United Way argues that, even assuming Aramony is entitled to RBP benefits, the court erred in applying principles of promissory estoppel to conclude that those benefits include compensation to make up for the impact of I.R.C. § 401(a)(17). Third, United Way argues that the district court erred in its calculation of consequential damages on its breach of fiduciary duty counterclaim.
 
 
 22
 Aramony's cross-appeal presents two issues. First, he asserts that the district court erred in denying him benefits under the SBA. Second, he argues that the court erred also in denying him attorneys' fees with respect to his successful claims.
 
 I. United Way's Appeal
 
 23
 A. Whether the district court erred in concluding that Aramony was entitled to benefits under the RBP
 
 
 24
 United Way contended in the district court that Aramony was not entitled to benefits under the RBP because: (1) the draft plan with its felony forfeiture provision, rather than the signed plan without it, controls as to the specific terms of the RBP; (2) in any event, the signed plan should be construed as containing a felony forfeiture provision; and (3) even if not, the benefit calculation formula provided in the signed plan refers to and depends upon a non-existent qualified contribution plan and, therefore, the RBP provides no benefits to anyone. The district court rejected these arguments, and United Way now appeals.
 
 
 25
 1. Whether the district court erred in determining that the signed plan controls as to the terms of the RBP
 
 
 26
 The district court's determination that the RBP does not contain a felony forfeiture provision turned in the first instance on its conclusion that the signed rather than the draft plan is the controlling manifestation of United Way's intent. In support, the court observed that the signed plan is an executed agreement, is complete as to all its terms, and has been disseminated to United Way's employees. SeeAramony, 28 F. Supp. 2d at 166. In contrast, the draft plan is unsigned, is incomplete in significant respects, and has not been disseminated at all. See id. The court then considered and rejected United Way's arguments that (1) the Executive Committee, by voting at the February 1984 meeting to adopt a replacement benefit plan, intended to incorporate all specific terms, including the felony forfeiture provision in the draft plan that was submitted to the Committee, see id., and (2) Paulachak, the senior vice president who signed the RBP, lacked authority to bind United Way to an agreement that lacked a felony forfeiture provision, see id. at 166-67.
 
 
 27
 On appeal, United Way argues that the district court erred both in determining that the February 1984 vote was not intended to bind United Way to the terms of the draft plan, and in concluding that senior vice president Paulachak had implied authority to bind United Way to the terms of the signed plan. These were factual determinations, made after a bench trial by the district court in its capacity as fact-finder. See Eli Attia Architects v. Safra, No. 94 CIV. 2928 (KMW), 1996 WL 480721, at *3 (S.D.N.Y. Aug. 23, 1996) (intent to enter into binding contract is question of fact under New York law); Rubin v. Dairymen's League Co-operative Ass'n, 259 A.D. 23, 25, 18 N.Y.S.2d 466, 468-69 (3d Dep't) (implied authority of agent to enter into a contract on company's behalf is question of fact under New York law) (citing Burke v. Bonat, 255 N.Y. 226, 174 N.E. 635 (1931)), aff'd, 284 N.Y. 32, 29 N.E. 458 (1940). Our review is therefore for clear error. See Fed. R. Civ. P. 52(a); Apex Oil Co. v. Vanguard Oil & Serv. Co., 760 F.2d 417, 421-22 (2d Cir. 1985) (clear error review applies to bench trial determination that contract was formed); cf. Masuda v. Kawasaki Dockyard Co., 328 F.2d 662, 664 (2d Cir. 1964) (reviewing, in the light most favorable to the plaintiff, the sufficiency of the evidence supporting jury's finding in the plaintiff's favor of implied authority).
 
 
 28
 We consider first United Way's claim that the Executive Committee, by voting in favor of a replacement benefit plan at the February 1984 meeting, intended to bind itself to the specific terms set forth in the draft plan put before it, including the felony forfeiture provision, and that the district court's contrary finding, that the board intended only to approve the general concept of an RBP while leaving the relevant details to be worked out between Paulachak and Mutual, was clearly erroneous. We conclude to the contrary that the district court's conclusion was well-supported by the record.
 
 
 29
 Robert Beck, the former chairman of United Way's board, testified that, in approving pension proposals, "the Board and/or the Executive Committee would get into enough detail to understand what was being proposed but certainly not into the drafting phase or -- or the real details of the particulars of the plan." Such details, Beck explained, would be left to "the employee benefit people who are our advisors." The agenda accompanying the draft plan, moreover, made no mention of specific details aside from the purpose of the RBP. There is no evidence that details of the RBP generally or the forfeiture provision in particular were discussed by the Executive Committee. The draft plan attached to the agenda was patently incomplete. And Paulachak testified that the board actually issued a resolution directing him to develop the RBP plan document in conjunction with Mutual. On this record, we cannot conclude that the district court erred, clearly or otherwise, in finding as a matter of fact that the board did not by its February 1984 vote intend to bind itself to the specific terms of the draft plan attached to the agenda before it rather than the formal draft prepared as a result of the action taken at the meeting.
 
 
 30
 For similar reasons, we cannot conclude that the district court erred in finding that senior vice president Paulachak had authority to bind United Way to the terms of the signed plan. "Implied authority may be viewed as 'actual authority given implicitly by a principal to his agent' or as a 'kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers.'" Masuda, 328 F.2d at 664-65 (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 85 (3d Cir.) (applying New York law), cert. denied, 364 U.S. 835 (1960)). "The general rule followed in New York is that 'an agent employed to do an act is deemed authorized to do it in the manner in which the business intrusted to him is usually done.'" Masuda, 328 F.2d at 665 (quoting Wen Kroy Realty Co. v. Public Nat. Bank & Trust Co., 260 N.Y. 84, 89-90, 183 N.E. 73, 74 (1932) (quoting Argersinger v. MacNaughton, 114 N.Y. 535, 537, 21 N.E. 1022, 1022 (1889))). In light of Paulachak's uncontradicted testimony that the board directed him to develop the RBP document in conjunction with Mutual, the court's finding of implied actual authority was warranted. The district court therefore did not err in concluding that the signed rather than the draft plan controls as to the terms of the RBP.
 
 
 31
 2. Whether the district court erred in concluding that the signed plan unambiguously does not include a felony forfeiture provision
 
 
 32
 United Way argues that even assuming the signed plan was effective, the district court erred by failing to read it to contain a felony forfeiture clause. The district court rejected this argument on the ground that the signed plan does not contain such a clause, providing unambiguously instead that "'rights under this Plan shall become nonforfeitable upon termination of employment.'" See Aramony, 28 F. Supp. 2d at 168.
 
 
 33
 As a general matter, unambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning. See, e.g., Devlin v. Transportation Communications Int'l, 173 F.3d 94, 103 (2d Cir. 1999); American Fed'n of Grain Millers v. International Multifoods Corp., 116 F.3d 976, 980 (2d Cir. 1997). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." O'Neil v. Retirement Plan for Sal. Empl. of RKO Gen., Inc., 37 F.3d 55, 59 (2d Cir. 1994) (internal quotation marks omitted). In making this determination, moreover, reference may not be had to matters external to the entire integrated agreement. See id. at 58-59. We subject the determination that an ERISA plan provision is unambiguous to de novo review. SeeI.V. Servs. of Am., Inc. v. Trustees of Am. Consulting Eng'rs Council Ins. Trust Fund, 136 F.3d 114, 119 (2d Cir. 1998).
 
 
 34
 Applying these standards to the signed plan, we agree with the district court's conclusion that the language is unambiguous. The signed plan simply does not include a felony forfeiture exception to its otherwise sweeping non-forfeiture clause. There is no basis upon which to read one into the contract.
 
 
 35
 3. Whether the district court erred in concluding that the signed plan's benefit formula is ambiguous and should be construed as referring to United Way's qualified defined benefit plan
 
 
 36
 United Way argues that the district court erred by failing to find that the signed plan's benefit calculation formula, referring as it does to a non-existent qualified defined contribution plan rather than United Way's qualified defined benefit plan, renders the entire document meaningless. The district court agreed that the "benefit formula, on its face, would not require the payment of any benefits." Aramony, 28 F. Supp. 2d at 167. Nonetheless, because "the provisions of an ERISA plan should be construed so as to render all provisions meaningful and to avoid illusory promises," the court concluded that the apparently meaningless provision is ambiguous. Id.at 167 (citing an earlier unpublished opinion of the district court in this case in turn citing Carr v. First Nationwide Bank, 816 F. Supp. 1476, 1493 (N.D. Cal. 1993) (internal quotation marks omitted)). The district court, referring to the mistaken reference as "akin to a scrivener's error," id. at 168, then resorted to external evidence of United Way's intent. It being undisputed that United Way had intended to base the benefit formula on its qualified defined benefit plan, the court so construed the signed plan. See id. at 167-68.
 
 
 37
 On appeal, United Way argues that the district court erred by failing to apply the "four-corners-of-the-document" approach to the determination of ambiguity in this instance despite having applied it strictly in the context of the forfeiture provision issue. We see no such inconsistency. It is true, of course, that in order to know that the signed plan's benefit formula is meaningless one must know also that United Way's underlying plan is a defined benefit plan. But it is not necessary to go beyond the scope of the "entire integrated agreement," O'Neil, 37 F.3d at 59 (internal quotation marks omitted), in order to know that. The signed plan specifically refers to and depends upon the existence of United Way's pension plan, incorporating it by reference. The entire integrated agreement therefore includes United Way's qualified defined benefit plan. It is this underlying plan that the benefit formula mistakenly calls a contribution plan, a mistake made obvious by reference to the qualified defined benefit plan itself. The ambiguity of the benefit formula in the signed plan is thus ascertainable without need to resort to matters outside the four-corners of the entire integrated agreement. There is no basis for concluding that the district court employed a double-standard in construing the forfeiture and benefit formula provisions.
 
 
 38
 We therefore affirm the decision of the district court that Aramony is entitled to benefits under the RBP.
 
 
 39
 B. Whether the district court erred in concluding that the RBP includes a benefit accounting for the subsequent enactment of I.R.C. §401(a)(17)
 
 
 40
 United Way contends next that, even assuming Aramony is entitled to benefits under the RBP, the district court erred in calculating the scope of the benefits provided under that plan to include a benefit offsetting the impact of I.R.C. §401(a)(17), a tax-code provision enacted subsequent to the adoption of the RBP that can limit significantly the amount of benefits available under the RBP.[3] United Way gave Aramony projections of the amount of his benefits that reflected inclusion of the §401(a)(17)-neutralizing benefit. SeeAramony, 28 F. Supp. 2d at 169-71. United Way challenges the district court's conclusion that United Way is thereby estopped from denying that the RBP provides this benefit.
 
 
 41
 "ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans." Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 79 (2d Cir.), cert. denied, 519 U.S. 1008 (1996). Federal courts hearing ERISA claims are not bound by the law of the state in which the claim arises. See id. With respect to claims of promissory estoppel in suits brought under ERISA, this Court has therefore adopted principles of promissory estoppel drawn from the law of various states. Under our case law, promissory estoppel in ERISA cases requires satisfaction of four elements drawn from the state common law of promissory estoppel: "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced." Id.
 
 
 42
 In order to lessen the danger that commonplace communications from employer to employee will routinely be claimed to give rise to employees' rights beyond those contained in formal benefit plans, however, we have added that an ERISA plaintiff must "adduce[] not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." Devlin, 173 F.3d at 102; see also Schonholz, 87 F.2d at 78; Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993), and cased cited therein.
 
 
 43
 Mutual, acting as United Way's agent, on two occasions gave benefit projections to Aramony that Aramony claimed amounted to representations that the RBP provides a §401(a)(17)-neutralizing benefit.[4] It was these "promises" that Aramony claimed and the district decided estopped United Way from denying that it was bound to provide the benefit. The court found that Aramony relied (common-law element no. 2) on the representations (element no.1) contained in the projections when he allocated the benefit to his wife during his divorce settlement, and that he consequently would be injured (element no.3) if he did not receive these funds. The court concluded also that it would be unjust (element no. 4) to deny the benefit to Aramony because the RBP was ambiguous as to whether it was intended to offset subsequently enacted tax laws such as §401(a)(17), and because Mutual's benefit projections implied that the RBP did in fact provide that benefit. Aramony, 28 F. Supp. 2d at 169-70.
 
 
 44
 The district court found the added requirement that "extraordinary circumstances" be shown in ERISA cases to be satisfied based on the same facts underlying its finding that it would be unjust to deny the benefit, especially the court's conclusion that the RBP is ambiguous on this point. In support, the court cited James v. New York City Dist. Council of Carpenters' Benefits Funds, 947 F. Supp. 622 (E.D.N.Y. 1996), which held that the "extraordinary circumstances" requirement may be satisfied if the promise in issue amounts to an interpretation of an ambiguous provision and not a modification of the plan. See Aramony, 28 F. Supp. 2d at 170-71. James derived this rule from the Eleventh Circuit's decision in Kane v. Aetna Life Ins. Co., 893 F.2d 1283, 1285-86 (11th Cir.) (oral representations on behalf of an employer interpreting ambiguous provisions in a medical benefit plan as to coverage of the plan binding on employer on promissory estoppel theory), cert. denied, 498 U.S. 890 (1990). Purporting to apply the Kane rule, and interpreting the representation that the RBP offsets the effects of §401(a)(17) as an interpretation of an ambiguity in the RBP, the district court in the case at bar apparently concluded that, because the projections were an interpretation not a modification of the RBP, the requisite "extraordinary circumstances" were present.
 
 
 45
 The problem with the district court's approach is that the Kane rule does not control in this Circuit. See Bonovich v. Knights of Columbus, 146 F.3d 57, 63 (2d Cir. 1998) (stating that the "Kane rule is not the law in this circuit.... Nor do we see any reason to adopt Kane at this time." ). Even if it did, however, it would not support the district court's analysis. The effect of the Kane rule is to limit the category of cases capable of otherwise satisfying the "extraordinary circumstances" requirement to the subset of those cases that involve an interpretation of an ambiguous ERISA plan provision; it does not follow from Kane -- or James, for that matter -- that all cases involving an interpretation of ambiguous plans necessarily present "extraordinary circumstances." Irrespective of whether the "extraordinary circumstances" requirement may be satisfied only in the context of a representation interpreting an ambiguity in an ERISA plan, the requirement is in any event not satisfied unless the surrounding circumstances are indeed beyond the ordinary. Cf. Devlin, 173 F.3d at 102 (emphasizing that a finding of "extraordinary circumstances" requires a "remarkable consideration" such as the use of a promise of benefits to induce certain behavior on the employee's part).[5]
 
 
 46
 Aramony points to nothing beyond the ordinary about the circumstances surrounding the promises allegedly made to him except his asserted ability to satisfy the common-law elements of promissory estoppel. Nothing, for example, suggesting that United Way made a promise to Aramony in order to induce him to take action for United Way's benefit only later to renege on the promise. That sort of behavior by an employer could, under Schonholz and Devlin, amount to "extraordinary circumstances."
 
 
 47
 Aramony relies on two determinations by the district court: that the RBP is ambiguous as to whether it provides this benefit, and that Mutual's benefit projections constituted a promise that the benefit is included. But this combination of ambiguity -- which we have concluded does not alone suffice to establish extraordinary circumstances -- and the promise element of ordinary estoppel analysis does not meet the standard articulated in Devlin either. We therefore conclude that Aramony's ERISA promissory estoppel claim fails.
 
 
 48
 The district court's alternative basis for its ruling does not rescue the claim. The court suggested in a footnote that extraordinary circumstances need only be shown where the "actuarial soundness" of an ERISA plan is in jeopardy and, because extension of the RBP to account for §401(a)(17) would not trigger this concern, Aramony was not obliged to make such a showing. See Aramony, 28 F. Supp. 2d at 171 n.25. We disagree.
 
 
 49
 It is true, as the district court pointed out, that in Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1041 (2d Cir. 1985), cert. denied, 475 U.S. 1012 (1986), we indicated that the adoption of the extraordinary circumstances requirement as a prerequisite for the maintenance of an estoppel claim in the ERISA context was rooted, at least in part, in a concern for the actuarial soundness of pension plans. In so doing, however, we did not bifurcate ERISA-context estoppel claims into those claims that threaten the actuarial integrity of a pension plan and therefore are subject to the extraordinary circumstances requirement, and those that do not and therefore are not subject to the requirement. Cf. Devlin, 173 F.3d at 102 (no mention of actuarial soundness); Bonovich, 146 F.3d at 63 (same); Schonholz, 87 F.3d at 79-80 (same); Lee, 991 F.2d at 1009 (same). It is well that we did not, given the difficulties that would confront courts attempting to determine whether an actuarial threat is or is not present. We thus disagree with the suggestion of the district court that because actuarial soundness is not in issue here, Aramony was not obliged to demonstrate extraordinary circumstances in this instance.
 
 
 50
 We therefore reverse the determination of the district court that United Way is estopped from denying that the RBP provides a benefit offsetting the effect of § 401(a)(17). As part of its estoppel analysis, the district court decided, however, that the RBP was ambiguous on this point. We remand, therefore, so that the district court may consider whether United Way is contractually bound by the RBP itself to provide the benefit to Aramony.
 
 
 51
 C. Whether the district court erred in calculating damages on United Way's breach of fiduciary duty counterclaim
 
 
 52
 After finding in United Way's favor on its breach of fiduciary duty counterclaim, the district court turned to the question of damages. The court first determined that, under New York state law, which the parties agree governs the counterclaims, Aramony was obliged to forfeit salary paid to him during his period of disloyalty. SeeAramony, 28 F. Supp. 2d at 176. The court concluded, however, that this forfeiture did not extend beyond the seven-year limitations period applicable to the breach of fiduciary claim, a period the court fixed as beginning in September 1989.[6] Seeid.
 
 
 53
 United Way contends that it was error for the district court thus to limit its recovery and that, because its claim was timely with respect to Aramony's misconduct occurring from 1989 onward, it should recover also for Aramony's earlier misconduct insofar as it, too, constituted a breach of fiduciary duty. In our view, United Way's argument amounts to a naked invitation to disregard the statute of limitations, and this we decline to do.
 
 
 54
 After determining the extent of Aramony's salary forfeiture, the district court next considered the question of consequential damages, determining that United Way was entitled to recover for any injury as to which Aramony's breach was a "substantial factor."[7] See id. at 176-77 (citing Milbank, 13 F.3d at 543). Applying this standard, the court concluded that United Way was entitled to recover for much but not all of the legal, investigative, and accounting costs it allegedly incurred as a consequence of Aramony's misconduct.
 
 
 55
 On appeal, United Way contends that the district court erred by failing to award it a full recovery as to each of these costs. The nub of United Way's argument is that, in order for it to recover one hundred percent of these costs, it was only necessary for it to demonstrate that Aramony's misconduct was a substantial factor as to some portion of them. We are not persuaded.
 
 
 56
 It is true, as United Way argues, that it is unnecessary under the "substantial factor" standard to demonstrate that a defendant's breach is the sole cause of an injury in order to recovery for the entire injury. But the fact that Aramony's misconduct was a substantial factor in causing United Way to pay for a wide variety of services does not entitle it to recover for other services that the court found to be unrelated to Aramony's misconduct simply because the same providers rendered the services and they bore some tangential relationship to Aramony's behavior. The district court therefore correctly concluded that United Way was obliged to establish separately the requisite causation as to these distinct services and costs, and we affirm its conclusion that United Way failed to do so.
 
 
 57
 Finally, United Way challenges the district court's decision to award no damages with respect to decreases in United Way's annual dues revenue and costs associated with those decreases. United Way characterizes the district court's opinion on this point as recognizing that Aramony's misconduct may have been a substantial factor in causing these injuries, but nonetheless declining to award damages on the inappropriate basis that the court could not quantify the extent of the decreases attributable to the misconduct. This is a misreading of the district court's ruling. The court specifically found that "Aramony's criminal conduct was not a 'substantial factor' in causing the post-1991 reduction in dues percentage or in contributions." Id. at 178.
 
 
 58
 United Way's argument that that conclusion was clearly erroneous is unpersuasive. United Way contends that the district court should have found that the misconduct was a substantial factor in the revenue decreases in light of press reports and opinion polls indicating the possibility that donors and potential donors may have been adversely affected by media reports of abuse of perks, mismanagement of funds, and embezzlement at United Way. While these reports and polls are consistent with United Way's interpretation of events, it does not follow that the district court's contrary conclusion was wrong. The evidence at trial supported the court's finding that, during the relevant period, United Way reduced the percentage of dues it collected from its local chapters, and there was no evidence conclusively linking this reduction with Aramony's misconduct. On the contrary, there was evidence that the reductions began prior to public revelation of Aramony's misconduct. Similarly, the district court's analysis of the opinion polls upon which United Way relies demonstrates persuasively that the polls fail to show the extent, if any, to which Aramony's misconduct may have contributed to a drop-off in donations to the locals. See Aramony, 28 F. Supp. 2d at 177-78. The district court's finding of fact was not clearly erroneous. Finally, we reject also United Way's token argument that the district court erred in failing to award it damages for the costs of public relations services provided to it by the firm of Hill & Knowlton. The district court concluded that none of Aramony's conduct occurring within the statute of limitations period was a substantial factor in causing this expense, see id. at 180, and United Way points to no particular or persuasive basis for reversing this conclusion.
 
 II. Aramony's Cross-Appeal
 
 59
 Although Aramony appeals the district court's determination that he is not entitled to benefits under the SBA, he fails to contest the basis for the court's ruling: that common-law forfeiture rules apply to the SBA, and that he forfeited his SBA benefits under those rules. Aramony's argument, in substance, is limited to the contention that there somehow is an inconsistency between the court's application of the statute of limitations to United Way's recovery of his salary on its breach of fiduciary duty counterclaim and the court's determination that Aramony's misconduct resulted in a forfeiture of benefits accrued under the SBA for a considerably longer period. Any discrepancy, however, is only apparent. The statute of limitations gave United Way a specified amount of time in which to commence a lawsuit to recover salary it paid to Aramony despite his disloyalty. See N.Y. C.P.L.R. §213-b. United Way is barred by the statute of limitations from bringing suit for and recovering salary from Aramony paid to him before the limitations period began. By contrast, the SBA is a contract under which United Way was to pay money to Aramony. The SBA did not provide that his rights under the SBA vested and became nonforfeitable at a particular time. On the contrary, because he was disloyal he forfeited all contractual rights he may otherwise have had under the SBA. This forfeiture is unaffected by when suit is brought by Aramony in an attempt to recover the benefits or when a defense is asserted by United Way to resist payment. That the statute of limitations limits United Way's tort claim for recovery of past salary is irrelevant to Aramony's contract claim under a contract that is now a nullity.
 
 
 60
 Aramony purports also to appeal the district court's denial of his claim for attorneys' fees, but he makes no attempt to specify how the district court abused its discretion in determining that an award was not justified. See Aramony, 28 F. Supp. 2d at 174-75 (applying the five-factor test governing this determination set forth in Chambless, 815 F.2d at 871). We perceive no error in the court's analysis in any event. Insofar as Aramony still pursues this argument, then, we reject it.
 
 
 61
 We therefore deny Aramony's cross-appeal.
 
 CONCLUSION
 
 62
 For the reasons set forth above, we affirm the decision of the district court except that we reverse with respect to its determination that United Way is estopped from denying that the RBP includes a benefit offsetting the impact of I.R.C. §401(a)(17). We remand solely for a determination whether Aramony nonetheless is contractually entitled to that benefit under the RBP.
 
 
 
 Notes:
 
 
 [1]
 The district court found that between September 1989 and December 1991, "Aramony improperly billed [United Way] for personal expenses, including (1) personal trips to Gainsville, Florida . . . ; (2) personal hotel accommodations . . . ; (3) personal car rentals . . . ; (4) his girlfriend's travel expenses . . . ; (5) a personal, overseas vacation . . . ; and (6) the furnishing of a Florida condominium . . . ." Aramony, 28 F. Supp. 2d at 158. The court also found that Aramony in April 1990 "fraudulently caused [United Way] to expend $375,000 to purchase an annuity for [Thomas] Merlo [an Aramony acquaintance and United Way employee], and to expend $125,000 to purchase a Florida condominium." Id. The court further found that Aramony "fraudulently caused [United Way] to expend $5,000 as a payment to Merlo for services he had not performed." Id. In addition, the court determined based on the evidence at trial that "between 1982 and September 1989, Aramony, through his assistants, regularly miscoded personal expenditures as business expenses, for the purpose of obtaining reimbursement from [United Way]." Id. at 159.
 
 
 [2]
 Aramony ultimately was indicted and convicted in the United States District Court for the Eastern District of Virginia of an array of federal crimes: conspiracy to defraud the United States by impeding the lawful functions of the IRS, in violation of 18 U.S.C. § 371; six counts of mail fraud, in violation of 18 U.S.C. § 1341; two counts of wire fraud, in violation of 18 U.S.C. § 1343; nine counts of engaging in the interstate transportation of fraudulently acquired property, in violation of 18 U.S.C. § 2314; two counts of engaging in monetary transactions in the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1957; three counts of filing false tax returns, in violation of I.R.C. § 7206(1); and two counts of aiding the filing of false tax returns, in violation of I.R.C. § 7206(2). See United States v. Aramony, 88 F.3d 1369, 1373 (4th Cir. 1996) (reversing solely as to the § 1957 convictions), cert. denied, 520 U.S. 1239 (1997). The district court sentenced Aramony to seven years' imprisonment and imposed on him a $300,000 criminal fine. See Aramony, 28 F. Supp. 2d at 157.
 
 
 [3]
 As noted, United Way's qualified defined benefit plan calculates benefits as a function of an employee's average salary over five years, multiplied by a set ratio, and multiplied again by the employee's years of service. Nonetheless, under I.R.C. § 415, the maximum benefit an employee may receive is capped at about $100,000 per year, an amount that changes with the change in the cost of living. It is not disputed that one of the purposes of the RBP is to make up for the shortfall in benefits resulting from the § 415 cap. Subsequent to the enactment of the RBP, however, Congress enacted § 401(a)(17), limiting the amount of an employee's salary that can be used in the underlying benefit calculation formula to $200,000, adjusted for inflation. $200,000 is far less than Aramony's salary. Unless the RBP is construed as accounting for the impact of § 401(a)(17), Aramony's benefits will thus be significantly reduced.
 
 
 [4]
 The projections did not explicitly state that the RBP provided a § 401(a)(17)-neutralizing benefit, but the court agreed with Aramony that the magnitude of the projections necessitated the conclusion that such a benefit in fact was provided since, otherwise, the projections would have been vastly overstated. Additionally, annual valuation reports prepared by Mutual for United Way explicitly indicated that Mutual was accounting for the impact of § 401(a)(17) on the RBP. See Aramony, 28 F. Supp. 2d at 169-70 & n.23.
 
 
 [5]
 In Schonholz, although explicitly acknowledging the extraordinary circumstances requirement, the Court did not discuss the requirement in the course of its analysis; instead, it merely analyzed whether the four basic elements had been met. See 87 F.3d at 78-80. For this reason, Schonholz might be read as standing for the proposition that the extraordinary circumstances requirement may be satisfied upon satisfaction of the four common-law estoppel factors. In Devlin, however, we noted and rejected this possible reading. See 173 F.3d at 102. Schonholz, according to Devlin, implicitly found an "extraordinary circumstance" in the facts before it because the promise in that case, before being withdrawn, was used by the employer/defendant to induce the plaintiff to retire. See id. In contrast, the alleged promise in Devlin was not an intentional inducement of any kind, nor was it in any other way "extraordinary." See id.
 
 
 [6]
 The district court noted first that United Way's counterclaim was subject to one of three statutes of limitations: (1) the seven-year period New York law provides to a crime victim to assert claims against his or her malefactor, see N.Y. C.P.L.R. § 213-b, (2) the six-year period New York law provides generally, see N.Y. C.P.L.R. § 213, or (3) the one-year period provided by Virginia law, see VA. CODE ANN. § 8.01-243. The court then concluded that the seven-year period was applicable because United Way "did not press the Court to decide this issue as it had the benefit of a seven year limitations period, even though its recovery was limited to damages caused by Aramony's criminal conduct." See Aramony, 28 F. Supp. 2d at 175 n.29. Because Aramony's conduct of conviction began no earlier than September 1989, the court subsequently referred to that date as the beginning of the limitations period, although the limitations period technically extended back to May 1989. See id. at 175-76.
 
 
 [7]
 On appeal, Aramony does not challenge the district court's use of this standard in an effort to overturn the damages award against him. Nonetheless, he relies on a recent decision by this Court, LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey, 173 F.3d 454, 465 (2d Cir. 1999) (rejecting use of "substantial factor" analysis, in favor of proximate causation, where remedy sought is compensatory damages rather than restitution) (citing American Fed. Group, Ltd. v. Rothenberg, 136 F.3d 897, 907 n.7 (2d Cir. 1998); R. M. Newell Co. v. Rice, 236 A.D.2d 843, 844-45, 653 N.Y.S.2d 1004, 1005 (4th Dep't 1997)), to argue that, if anything, the causation standard employed by the district court was erroneously lax. Because we conclude that United Way's damages arguments fail in any event, it is unnecessary for us to consider the applicability of those decisions to this appeal.