**A. James EDWARDS, Plaintiff,**

v.

**AKZO NOBEL, INC., et al., Defendants.**

**No. 99–CV–6583L.**

United States District Court, W.D. New York.

Sept. 17, 2001.

Raymond M. Schlather, LoPinto, Schlather, Solomon & Salk, Ithaca, NY, for Plaintiff.

Eugene D. Ulterino, Nixon Peabody LLP, Rochester, NY, Richard Thaler, Ithaca, NY, for Defendants.

*DECISION AND ORDER*

LARIMER, Chief Judge.

## INTRODUCTION

Plaintiffs commenced this action on November 23, 1999, under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover certain retirement benefits allegedly due them under the Akzo Nobel Retirement Account Plan ("the Plan"). The original complaint contained six causes of action, under ERISA and other federal and state theories of liability, and named as defendants Akzo Nobel, Inc. ("Akzo"), the Plan, by its representative, Akzo Nobel Retirement Account Plan Pension Committee ("the Committee"), and Cargill, Inc. After all defendants filed motions to dismiss, on June 19, 2000, the court issued a Decision and Order granting those motions with respect to all claims except plaintiffs' claim under 29 U.S.C. § 1132(a)(1)(B) against the Plan and the Committee ("defendants"). *Edwards v. Akzo Nobel, Inc.*, 103 F.Supp.2d 214 (W.D.N.Y.2000). Defendants have now moved for summary judgment on that sole remaining claim. Plaintiffs have cross-moved "for an Order denying defendants' motion for summary judgment or, in the alternative, deferring action on said motion pending the completion of all discovery, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure."

The relevant facts are set forth in my June 19 Decision and Order, familiarity with which is assumed. In short, the five plaintiffs were all formerly employed at Akzo's facility in Watkins Glen, New York.

In late 1996, Akzo agreed to sell the facility and its other salt-producing operations to Cargill; the actual transfer occurred on April 25, 1997.

The purchase agreement provided, *inter alia*, that Akzo would "retain the assets, sponsorship, administration of and liability for all benefit obligations pursuant to its benefit plans," and that Akzo would "fulfill its obligations in accordance with [its] pension plans without regard to whether or not an eligible retiree is employed by Cargill." Amended Complaint Ex. A. The agreement stated, "It is expressly understood and agreed that Cargill is not assuming any obligations or liabilities under [Akzo's] benefit plans." *Id.*

At the time of the transfer, plaintiffs were all within two years of reaching their fifty-fifth birthdays, which was the minimum age for taking early retirement under the Plan. After the transfer took place, plaintiffs initially continued working at the Watkins Glen facility, but as employees of Cargill. Within six months after the transfer, however, Cargill terminated all five plaintiffs.

In August 1998, plaintiffs (who turned fifty-five on dates ranging from July 1997 to February 1999) applied to defendants for pension benefits under the Plan. Defendants granted their applications, but treated them as having been terminated from Akzo's employ at the time that the Watkins Glen facility was transferred to Cargill on April 25, 1997. That determination had an effect upon the amount of plaintiffs' benefits, because § 4.05(c) of the Plan provides that a terminated Plan member may

elect ... to have his Pension begin as of the first day of any month following his 55th birthday and prior to his Normal Retirement Date [age 65]. In such event, the Member's Pension shall be reduced by one-half of one percent

(0.5%) for each full month by which the Benefit Commencement Date precedes the Member's Normal Retirement Date. Because defendants determined that plaintiffs had been terminated on April 25, 1997, plaintiffs' benefits were calculated by taking the amount that they would have received had they retired at age sixty-five, and reducing that amount by 0.5% for each month by which their benefit commencement date preceded their sixty-fifth birthdays.

Plaintiffs allege that they should have been given the benefit of the early retirement provision, which is contained at § 4.03 of the Plan. That section provides that any employee age fifty-five or older with at least 10 years of service may retire, in which case the employee's benefit is to be reduced by 0.5% for each month prior to the employee's *sixty-second* birthday. Plaintiffs contend that because they are all now over age fifty-five, and all have over ten years of service with Akzo, their benefits should be calculated under this provision. Plaintiffs allege that defendants' use of the age sixty-five figure in § 4.05, rather than sixty-two as provided in § 4.03, as the basis upon which to reduce their benefits, has caused them to lose at least eighteen percent of the value of their pension benefits.

Based on these allegations, plaintiffs have asserted a claim for benefits allegedly due to them under the Plan, pursuant to 29 U.S.C. § 1132(a)(1)(B).

## DISCUSSION

### I. Standard of Review

■ The first issue that must be addressed is the proper standard of review to be applied to defendants' decision concerning the proper calculation of plaintiffs' benefits. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under [29 U.S.C. § 1132(a)(1)(B)] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." The Second Circuit has stated that "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Kinstler v. First Reliance Std. Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir.1999) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995)); *see also O'Shea v. First Manhattan Co. Thrift Plan & Trust*, 55 F.3d 109, 112 (2d Cir. 1995) (denial is arbitrary and capricious where plan administrator or fiduciary has "impose[d] a standard not required by the plan's provisions, or interpret[ed] the plan in a manner inconsistent with its plain words") (citation and internal quotation marks omitted). The burden of establishing that the arbitrary-and-capricious standard applies is upon the plan administrator, since "the party claiming deferential review should prove the predicate that justifies it." *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir.1995).

■ Defendant contends that the court should apply the arbitrary-and-capricious standard because the Plan gives the administrator, the Pension Committee, discretion to determine benefits and construe the Plan. Plaintiffs do not appear to quarrel with that proposition, and indeed the Plan states that the Pension Committee has "the power, authority and responsibility to ... determine all benefits and the resolution of all questions arising in the administration, interpretation and application of the Plan either by general rules or by particular decisions including the right

to remedy possible amibiguities, inconsistencies or omissions . . . ." Affidavit of Eugene D. Ulterino (Docket Item 24), Ex. A at 60. The Pension Committee also has the authority to "establish such general rules, regulations, policies, practices and procedures, as well as standing interpretations of general application, as may be necessary to carry out its duties and in connection with its responsibility to control and maintain the operation and administration of the Plan . . . ." *Id.* That language does indicate that the administrator has discretionary authority to determine eligibility for benefits and to construe the terms of the plan. *See Bendixen v. Standard Insurance Co.,* 185 F.3d 939, 943 n. 1 (9th Cir.1999) (plan stating, "we have full and exclusive authority . . . to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy" conferred discretionary authority on administrator); *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 438 (3d Cir.1997) (applying abuse of discretion standard to plan which provided that "[i]n reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan"); *Kocsis v. Standard Ins. Co.,* 142 F.Supp.2d 241, 251–52 (D.Conn. 2001) (language reserving to plan administrator "full and exclusive authority . . . to interpret the Group Policy and resolve all questions arising in the administration, interpretation, and application of the Group Policy," was sufficient, albeit without using the word "discretion" or "discretionary," to trigger application of arbitrary-and-capricious standard).

Plaintiffs, however, assert that a conflict of interest may exist on the part of the Plan administrator because it appears that the members of the Pension Committee were appointed by, and are employees of, Akzo. Plaintiffs maintain that further discovery is necessary to determine whether that is in fact the case, but that if it is, then the court should take this factor into account in determining whether the administrator's decision was arbitrary and capricious. Defendant does not appear to deny that the Committee members are appointees and employees of Akzo, but asserts that this does not give rise to a conflict of interest.

■ Neither party's position is entirely correct. The rule is that if the plan administrator is an arm of the employer, *and* the plan is *funded* by the employer, the court may take that into account in deciding whether the defendant acted arbitrarily and capriciously. *Darling v. E.I. DuPont de Nemours & Co.,* 952 F.Supp. 162, 164–65 (W.D.N.Y.1997) (citing *Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 442 (2d Cir.1995)); *see also Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir.) (degree of deference afforded to plan administrators would properly be reduced in cases involving "unfunded plans where benefits come directly from the sponsor's assets and funded plans where the sponsor's contributions each year are determined by the cost of satisfying plan liabilities in the immediately preceding year"), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *Sansevera v. E.I. DuPont de Nemours & Co.,* 859 F.Supp. 106, 112 (S.D.N.Y.1994) ("The fact that the Plan is funded by DuPont raises a potential conflict of interest in the Board's decision to deny Sansevera's application, and therefore will be considered in deciding whether the Board acted arbitrarily or capriciously").

■ In addition, the Second Circuit has stated that

in cases where the plan administrator is shown to have a conflict of interest, the test for determining whether the admin-

istrator's interpretation of the plan is arbitrary and capricious is as follows: Two inquiries are pertinent. First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict. If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo. Sullivan v. LTV Aerospace & Def. Co.,* 82 F.3d 1251, 1255–56 (2d Cir.1996); *see also Kocsis,* 142 F.Supp.2d at 253 (court will defer to administrator's reasonable decision unless plaintiff can show how alleged conflict affected that decision); *accord Roberton v. Citizens Utilities Co.,* 122 F.Supp.2d 279, 286–87 (D.Conn.2000).

As stated, there appears to be no dispute here that the administrator in this case was appointed and is employed by Akzo. In addition, Article III of the Plan indicates that the Plan is funded entirely by Akzo. Section 3.01 states that "[i]t is the intention of the Employer to continue the Plan and make contributions necessary to meet minimum funding standards prescribed by law." Section 3.05(a) states, "No contributions shall be required by Members and no voluntary contributions may be made to the Plan by Members." Ulterino Aff., Ex. A at 22–23. Thus, the court may take these factors into account in determining whether to uphold the administrator's decision, but the court must still apply the arbitrary-and-capricious standard unless it finds that that decision was actually influenced by a conflict of interest on the part of the Pension Committee.

## II. Calculation of Plaintiffs' Benefits

Defendants contend that they are entitled to summary judgment because the Pension Committee's interpretation of the Plan was neither arbitrary nor capricious. Defendants assert that the Committee's decision was in fact mandated by the terms of the Plan.

In response, plaintiffs state that there are a number of issues of material fact concerning the underlying events. Plaintiffs contend that additional discovery is needed concerning these matters. In support of that assertion, plaintiffs' attorney has submitted an affidavit pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, detailing why further discovery is needed.

After reviewing the record, I find that there are no genuine issues relating to any material fact, and that defendants are entitled to summary judgment. Based upon the undisputed facts and the plain language of the Plan, the Plan administrator's decision cannot be said to have been arbitrary and capricious, and there is no evidence that that decision was affected by any conflict of interest.

First, I am not convinced that further discovery is needed to enable plaintiffs to respond adequately to defendants' motion for summary judgment. Plaintiffs' contention that they need discovery concerning the "administrative record," *i.e.,* whatever documents or other evidence was considered by the Committee in making their determination, is not persuasive. The case cited by plaintiffs, *Miller v. United Welfare Fund,* 72 F.3d 1066 (2d Cir. 1995), involved coverage for medical benefits and whether certain care was "medically necessary," which necessitated some inquiry into the plaintiff's condition. In contrast, in the case at bar, the facts are largely undisputed, and the real issue is simply one of plan interpretation. The relevant documents are already in the record before the court, and I am not persuaded by plaintiffs' speculation that some

unspecified additional documents might shed any light on any disputed issues in this case, since those issues are legal rather than factual in nature.

▮ The extensive record that has been presented here, particularly the Plan itself, supports the Administrator's decision in this case. As stated, § 4.03 of the Plan provides that a "member who has attained his Early Retirement Date may retire" and begin receiving early retirement benefits. "Early Retirement Date" is defined in § 1.14 as the "first day of any month following the Member's attainment of age 55 and the completion of 10 Years of Service." Ulterino Aff., Ex. A at 6. The oldest plaintiff in this action, however, A. James Edwards, did not turn fifty-five until July 18, 1997, almost three months after the Watkins Glen facility was transferred to Cargill. None of the plaintiffs, therefore, was eligible to receive early retirement benefits under § 4.03 at the time that they ceased to be Akzo employees.

The fundamental problem with plaintiffs' claim is that none of them retired *from Akzo*, and there was no provision in the Plan, the purchase agreement, or elsewhere, whereby their time at Cargill should have been counted toward the calculation of their retirement benefits. Rather, plaintiffs ceased to be Akzo employees, and became Cargill employees instead, and then were later terminated by Cargill.

Section 4.05, the section under which plaintiffs' benefits were calculated, clearly governs this situation, as it provides for a certain level of benefits "[i]f the Member's employment with all Employers and Affiliates is terminated for reason other than retirement at a Retirement Date[1] or death." "Employer" is defined as "The Company and any other entity participat-

ing in the Plan in accordance with Section 7.01." *Id.* § 1.17, at 8. The "Company" is "Akzo American Inc. or any successor." *Id.* § 1.10, at 5. "Affiliate" is defined with reference to the Tax Code, and essentially involves corporations in a parent-subsidiary or similar relationship involving a "controlled group" or corporations. *Id.* § 1.03 at 1–2. It cannot reasonably be disputed that: (1) Cargill is not considered an employer or affiliate under the Plan, so that the key is when plaintiffs' employment with *Akzo* and its affiliates terminated; and (2) plaintiffs' employment with Akzo terminated for a reason other than retirement: the transfer of Akzo's assets to Cargill.

Plaintiffs' contention that they all met the criteria for early retirement under § 4.03 is simply not supported by the terms of the Plan, for the simple reason that none of them had reached age fifty-five at the time that their employment at *Akzo* terminated. The purchase agreement makes clear that, with the exception of specific employees identified by Cargill as employees that it would not retain following the transfer (none of whom are plaintiffs in this action), "substantially all" of Akzo's employees would be employed by Cargill following the transfer. Ulterino Aff. Ex. B at 21. The complaint itself alleges that plaintiffs were discharged *by Cargill* on various dates after the transfer. Amended Complaint ¶ 28.

Thus, even if plaintiffs could be considered to have "retired" at some point after reaching age fifty-five, they could not have retired *from Akzo*, because at that point they no longer worked for Akzo. A person cannot "retire" from employment with a company that he no longer works for.

---

1. "Retirement Date" is defined as the "Member's Normal Retirement Date, Early Retirement Date, Disability Retirement Date or De- ferred Retirement Date." Ulterino Aff. Ex. A at 14.

In addition to their argument that the Plan language itself supports their claim-which it does not-plaintiffs also attempt to show that material issues of fact exist that preclude summary judgment in defendants' favor. A careful examination of the record demonstrates otherwise, however.

First, plaintiffs point to a letter dated June 23, 1997, from Akzo's Deputy Chairman, Herman van Karnebeek, to plaintiff Edwards that states, *inter alia,* that "the employees of Watkins Glen were not terminated from Akzo Nobel . . . ." Affidavit of Raymond M. Schlather (Docket Item 29), Ex. A. Plaintiffs contend that this gives rise to an issue of fact concerning whether they were in fact "terminated" by Akzo for purposes of the Plan.

When viewed in context, however, this statement fails to support plaintiffs' assertion. What van Karnebeek told Edwards is the following:

> In regards to your personal situation, it is unfortunate that your age and service did not qualify you for immediate early retirement under the Akzo Nobel Retirement Plan. Since the employees of Watkins Glen were not terminated from Akzo Nobel, severance pay and early retirement windows programs were not offered based on the contractual agreement with Cargill, Inc.

This passage is notable for two things: first, van Karnebeek stated that plaintiff did *not* qualify for early retirement under the Plan. Thus, the letter does not support plaintiffs' claims.

Second, van Karnebeek's statement that "the employees of Watkins Glen were not terminated from Akzo Nobel," read in context, cannot be given the construction that plaintiffs seek to impose upon it, *i.e.* that the transfer to Cargill had not resulted in the termination of plaintiffs' employment at Akzo. In the preceding paragraph of the letter, van Karnebeek explained that as a result of the resolution of certain antitrust

matters with the United States Department of Justice, the agreement with Cargill "required the direct hiring of all employees" by Cargill. It would therefore be absurd to interpret van Karnebeek's statement about employees not having been terminated from Akzo Nobel as meaning that plaintiffs continued to be considered Akzo employees even after the transfer to Cargill, *i.e.,* after their "direct hiring" by Cargill. Rather, van Karnebeek's statement appears only to be intended to explain why plaintiffs were not eligible for severance or early retirement window programs: because their actual termination from employment was effected by Cargill, not Akzo, and Cargill had no obligation to provide benefits under the Plan.

Pursuant to the terms of the purchase agreement, Cargill directly hired plaintiffs at the time of the transfer, so that plaintiffs continued to work at the same facility, albeit for a new employer. Cargill, however, assumed no obligations or liabilities under any of Akzo's benefit plans. Cargill's termination of former Akzo employees like plaintiffs therefore had no impact on those employees' rights under the Akzo Plan. The purchase agreement provided that all transferred employees would "cease to accrue service credit" in Akzo's retirement plans, and would "otherwise cease active participation" in those plans. Ulterino Aff. Ex. B at 24. That explains van Karnebeek's statement that the Watkins Glen employees were not offered severance pay or early retirement "based on the contractual agreement with Cargill, Inc."

I recognize that on a motion for summary judgment, the court's task is to determine whether factual issues exist, not to resolve those issues. That does not mean, however, that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts. *See In re*

*Coordinated Pretrial Proceedings*, 906 F.2d 432, 441 (9th Cir.1990) (district court may refuse to draw unreasonable inferences on motion for summary judgment), *cert. denied*, 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). Plaintiffs' interpretation of van Karnebeek's statements is literally nonsensical, as it would have made no sense for van Karnebeek to have stated ·or believed that plaintiffs had continued to be Akzo employees, for purposes of the Plan, after they began working for Cargill.

■ Plaintiffs also argue that, even assuming that § 4.05 applies to them, an issue of fact exists concerning whether plaintiffs fall within an exception set forth in § 4.05(b)(iii). That subsection, which became effective as of January 1, 1995, provides that

> for purposes of Section 4.05 only, a Member's employment shall not be deemed terminated with all Employers and Affiliates if (A) the Member's Employer, business unit, group or division is sold; (B) the member accepts employment with the purchaser or an affiliate of purchaser; and (C) the Member's employment with the purchaser or an affiliate of purchaser is deemed not to result in a "separation of service" in accordance with the applicable provisions of the [Internal Revenue] Code, regulations thereto and ERISA. Until the Member is deemed to have "separated from service", no vested benefit can be paid in accordance with this Section 4.05.

Affidavit of A. James Edwards (Docket Item 16) Ex. O at 1. Plaintiffs allege that they were told by the Pension Committee that this provision was added to the Plan as a result of Internal Revenue Service interpretations concerning the "Same Desk Rule."[2] Plaintiffs contend that whether the Same Desk Rule applies to them gives rise to an issue of fact concerning whether their employment with Akzo should have been deemed to have terminated as of the date of the transfer to Cargill.

The problem with plaintiffs' position, however, is that they did experience a "separation from service" when they became Cargill employees. The Plan defines "separation of service" as "Severance of the employment relationship between the Employee and all Employers and Affiliates." Ulterino Aff. Ex. A, § 1.32, at 14. As explained above, "employer" and "affiliates" are defined as Akzo and related corporations.

There clearly was no "employment relationship" between plaintiffs and Akzo after the transfer to Cargill. In several cases involving the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Second Circuit has identified four factors to consider in applying an "economic reality" test to determine whether an entity constitutes an employer under the FLSA: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Herman v. RSR Security Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir.1999) (quoting *Carter v. Dutchess Comm. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)).

Although the instant case does not involve the FLSA, these factors are nonethe-

---

**2.** The Same Desk Rule provides that for certain tax purposes, an employee does not incur a separation of employment where the employee remains in the same job following a transfer of assets to a new employer. *See Hunter v. Caliber System, Inc.*, 220 F.3d 702, 715 (6th Cir.2000); *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1146 (3d Cir.1993) (citing Rev. Rul. 79–336, Rev. Rul. 80–129, Priv. Ltr. Rul. 86–14–048 (Jan. 9, 1986)), *cert. denied*, 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994).

less worthy of consideration, since both the Supreme Court and the Second Circuit have noted the "'expansiveness' of the FLSA's definition of employer." *Herman,* 172 F.3d at 139 (quoting *Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 38 L.Ed.2d 406 (1973)). It is plain that Akzo could not be considered to have been plaintiffs' employer after the Watkins Glen facility was transferred to Cargill, and there is no allegation that Akzo did have any of the common or traditional attributes of an employer with respect to plaintiffs after that date.

Likewise, there is no basis upon which one could find that Cargill was an "affiliate" of Akzo as that term is defined in the Plan. Akzo and Cargill are completely separate corporations, and there is no evidence or allegation that either of them in any way controls the other, or that they are at all jointly controlled.

The conclusion that plaintiffs here did experience a separation from service finds support in *Hein v. F.D.I.C.,* 88 F.3d 210 (3d Cir.1996), *cert. denied,* 519 U.S. 1056, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997). The plaintiff in *Hein* had worked for a bank for thirty-seven years when the bank was taken over by the Federal Deposit Insurance Corporation ("FDIC") as receiver in bankruptcy. At that time, the plaintiff was fifty-four years old, and had planned to take early retirement upon reaching age fifty-five, the minimum age for early retirement.

The FDIC subsequently sold the bank's corporate assets to another corporation ("First Fidelity"), but retained control of the bank's corporate pension plan. The plaintiff continued to work in the same position with First Fidelity, but retired soon after the sale, at age fifty-five. His claim for unreduced early retirement benefits was denied, and the plaintiff brought an ERISA action against the F.D.I.C. and the plan, alleging that the defendants should have counted his service with First Fidelity so that the plaintiff could "grow into" the unreduced early retirement benefits provided by the pension plan.

The Court of Appeals for the Third Circuit held that the complaint should be dismissed, stating that "[i]t was one of the conditions originally imposed by the Plan that Hein reach age fifty-five while employed at the Bank in order to qualify for unreduced early retirement benefits," and that because the plaintiff had not satisfied that plan requirement, the court "cannot read ERISA to change the terms of the Plan and vest Hein with a benefit for which he never qualified." *Id.* at 218. The court also held that the "same desk rule" did not apply to the plaintiff, because there had not been any transfer of plan assets to First Fidelity, the successor corporation. *Id.* at 218–19. That reasoning applies in the case at bar as well.

This result is also consistent with the Internal Revenue Service's own interpretation of what constitutes a "separation from service." For example, Revenue Ruling 2000–27, 2000–21 I.R.B. 1016 (May 22, 2000), discusses a situation in which "Employer X" sells less than substantially all (*i.e.,* less than 85%) of the assets used by Employer X in a trade or business to Employer Y. Most of the employees of Employer X associated with the transferred assets (the "transferred employees") are hired by Employer Y and continue to perform, without interruption and in the same capacity, the same functions for Employer Y that they performed for Employer X, for whom they no longer perform services. In addition, Employer Y does not assume the assets and liabilities of the applicable portion of the 401(k) plan of Employer X. Under this scenario, the revenue ruling holds that the transferred employees are not employed in a continuation of the same trade or business and that

the change in their employment status is sufficient to constitute a "separation from service" within the meaning of section 401(k)(2)(B)(i)(I) of the Code, which permits distributions from the 401(k) plan of Employer X to the transferred employees. *See also Priv. Ltr. Rul.* 9622038 (Mar. 5, 1996) (no separation from service under fact patterns involving employees working at same jobs for new employer, and transfer of plan assets to new employer).[3]

The same situation exists here. No Plan funds attributable to plaintiffs were transferred to a Cargill plan following the transfer of the Watkins Glen facility. The purchase agreement expressly provided that *Akzo* would "retain the assets, sponsorship, administration of and liability for all benefit obligations pursuant to its benefit plans," and that "Cargill is not assuming any obligations or liabilities under [Akzo's] benefit plans." There is no basis, then, upon which to conclude that plaintiffs did not experience a separation of service, and § 4.05(b)(iii) therefore has no application to them.

■ Plaintiffs argue that there is at least an ambiguity between §§ 4.03 and 4.05, and that the ambiguity should be construed against Akzo, the drafter of the Plan. That rule of construction, however-which the Second Circuit has described as a principle "of last resort," *see O'Neil v. Retirement Plan,* 37 F.3d 55, 61 (2d Cir. 1994)-applies only when the court is conducting a *de novo* review, which, for the reasons already explained, I am not doing in the case at bar. *See, e.g., Masella v. Blue Cross & Blue Shield,* 936 F.2d 98, 107 (2d Cir.1991). The ·issue before me is whether the Plan administrator's interpre-

tation of these provisions was arbitrary and capricious, and I do not find that it was.

Plaintiffs also contend that there are issues of fact concerning whether defendants have treated other Plan members more favorably than plaintiffs, and about whether defendants made certain promises to plaintiffs regarding their eligibility for early retirement benefits after the sale to Cargill. Neither of these matters implicates any genuine issue of material fact, however.

■ Both of these matters relate to plaintiffs' allegation that defendants represented to them that plaintiffs would be allowed to "bridge" to early retirement. According to plaintiffs, they were told that employees close to age fifty-five would be considered not terminated by Akzo at the time of the transfer to Cargill, so that they could reach age fifty-five and take early retirement. Plaintiff allege that some employees at a different Akzo facility ("Clarks Summit"), which was also transferred to Cargill, were allowed to bridge to age fifty-five in this manner.

These claims suffer from several defects. First, to the extent that plaintiffs allege that they were treated differently from Clarks Summit employees, that in itself does not support a claim under ERISA, as explained in my June 19, 2000 Decision and Order. "[P]laintiffs' claim is simply that defendants did not correctly apply the Plan provisions to them, regardless of how they may have treated other employees." *Edwards,* 103 F.Supp.2d at 218.

Second, there is no evidence that the Plan itself was applied differently to

---

**3.** I am not persuaded by plaintiffs' contention that they should be permitted discovery to determine if the sale to Cargill involved 85% or more of Akzo's assets. For one thing, that would have no bearing on whether plaintiffs experienced a separation of service under the

terms of the Plan itself, which they clearly did. For another, the import of *Hein* and the cited I.R.S. rulings is that the same-desk rule does not apply unless there has been a transfer of plan assets to the new employer.

Clarks Summit employees compared to similarly situated Watkins Glen employees. Plaintiffs have submitted a copy of a letter dated June 12, 1997, to one Ronald Pierce (apparently a Watkins Glen employee) from Dan Barker, Chief Human Resources Officer at Akzo's Chicago headquarters, responding to an inquiry from Pierce. The letter states, *inter alia:* "Your position was not transitional in the definition of Clark [sic] Summit employees. That is, several Clark Summit employees were given the opportunity for very short 'transitional employment' at the request of Cargill, Inc. This situation is different at Watkins Glen in that your position is expected to continue on past your Cargill, Inc. employment period." Schlather Aff. Ex. F.

The implication of this letter appears to be that some employees at Clarks Summit, who were not expected to continue at Cargill for any long term, were allowed to remain employed long enough to become eligible for early retirement. Plaintiffs' situation was different, inasmuch as Cargill had agreed to retain them as its own employees after the transfer. That Cargill ultimately dismissed plaintiffs within a matter of months does not alter the fact that *Akzo* did not apply the Plan to plaintiffs in a discriminatory manner.

Plaintiffs also rely upon a message left on Edwards's telephone answering machine by Guy Catania, Akzo's Human Resources Director, responding to a memo to Catania from Edwards concerning severance and early retirement. Edwards's memo asked four questions, the first of which was: "If I am not offered a substantially similar job by Cargill or do not wish to transfer and choose the 60-week severance, can I take the three months needed to get me to the early retirement age of 55?" Schlather Aff. Ex. C. In his message, Catania stated, "The answer to your Number 1 question is 'yes.'"

The problem is that Edwards *was* offered, and accepted, a job by Cargill. His inquiry concerned what would happen if Edwards did *not* transfer to Cargill, and took Akzo's severance package. Catania's explanation of those matters has no bearing on whether plaintiffs were promised that they would be bridged to early retirement.

Plaintiffs' reliance on a March 21, 1997 memorandum from Guy Catania to "All Salaried Employees" of Akzo is equally misplaced. That memorandum contains a number of questions and answers meant to address Akzo employees' concerns about the effect upon their benefits of the sale to Cargill. Question 8 states, "What severance can I expect as an active employee who is hired by Cargill but later terminated?" The answer states:

> Cargill has agreed to pay the Akzo Nobel Salt standard severance practice (i.e., commonly referred to as the enhanced severance package) for salaried employees terminated within a period of twelve months from the closing date of the sale. Terminations by Cargill after 12 months will be covered under Cargill's regular severance policy in effect at that time.

Supplemental Affidavit of Eugene D. Ulterino (Docket Item 36), Ex. 4.

A similar memorandum dated February 18, 1997, which describes Akzo's "standard severance practice," states, *inter alia,* that "[s]eparated employees age 53 + with at least 8 years service may elect to spread the salary continuation amount over a two year period in order to improve their pension position." Affidavit of Lawrence E. Scofield (Docket Item 35), Ex. A at 3. That memorandum also states that "Cargill today has agreed to continue the Akzo Nobel Salt Inc. standard severance practice for most employees offered Cargill employ-

ment for a period of six months from the closing date of the sale." *Id.* at 2.

Plaintiffs contend that these statements collectively amounted to a promise by Akzo that transferred employees terminated between the ages of 53 and 55 would be allowed to "bridge" to early retirement, by treating their severance benefit as a two-year extension of their employment. The March 21, 1997 memorandum, however, merely states that Cargill would *pay* the same severance benefits as Akzo for employees terminated within twelve months of the sale. In addition, the answer to Question 9, which addresses whether severance payments are payable over time or in a lump sum, states, *inter alia,* that "Cargill does not provide pension credit ... while severance payments are made over a period of time." The clear implication of that statement is that employees receiving severance benefits would not be allowed to continue accruing pension benefits during that period, which should have dispelled any notion that Cargill had agreed to allow employees to bridge to early retirement. At any rate, these statements do not alter the fact that plaintiffs were not eligible for early retirement benefits under the terms of the Plan itself, and plaintiffs have not demonstrated the "extraordinary circumstances" needed to apply the doctrine of promissory estoppel in an ERISA case. *See Aramony v. United Way Replacement Benefit Plan,* 191 F.3d 140, 151 (2d Cir.1999); *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 78 (2d Cir.1996).

In short, plaintiffs' claims seek to obtain a level of benefits to which they are simply not entitled under the terms of the Plan. At the time at which they ceased to be employees of Akzo, plaintiffs had not met the Plan criteria for early retirement benefits, and nothing that happened afterwards altered that fact. Under the terms of the purchase agreement between Akzo and

Cargill, plaintiffs' rights under the Plan froze at the time of the transfer of the Watkins Glen facility to Cargill, which assumed no liability under the Plan. Although plaintiffs may understandably feel aggrieved at having been terminated by Cargill a short time later, that does not mean that, for purposes of calculating their level of benefits, the terms of the Plan can be ignored or rewritten. The Plan administrator's determination that plaintiffs were deemed to have been terminated from Akzo's employ on April 25, 1997, the date upon which the Watkins Glen facility was transferred from Akzo to Cargill, cannot fairly be characterized as arbitrary or capricious, and defendants are therefore entitled to summary judgment.

### CONCLUSION

Defendants' motion for summary judgment (Docket Item 21) is granted, and the complaint is dismissed. Plaintiffs' cross-motion for an order denying defendants' motion for summary judgment, or in the alternative, deferring action on defendants' motion pending completion of discovery (Docket Item 26) is denied.

IT IS SO ORDERED.