Vincent BERK and Ellen
Berk, Plaintiffs,

v.

ST. VINCENT'S HOSPITAL AND MED-
ICAL CENTER, Andrew Feldman,
M.D., and University Place Orthope-
dics, Defendants.

No. 03 CIV. 4868(VM).

United States District Court,
S.D. New York.

Aug. 11, 2005.

Cheryl Martha Wendt, Shaub, Ahmuty, Citrin & Spratt, Lake Success, NY, Michael P. Carbone, Gordon & Silber, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Vincent Berk ("Berk") and Ellen Berk, Berk's wife, brought a medical malpractice action in New York State Supreme Court against Andrew Feldman, M.D. ("Feldman"), University Place Orthopedics ("UPO"), a limited liability partnership of which Feldman is a member, and St. Vincent's Hospital and Medical Center ("St.Vincent's"). The case was removed to this Court pursuant to 28 U.S.C. § 1441. Berk's complaint alleges that Feldman, St. Vincent's and UPO committed malpractice during the course of Berk's treatment for a knee injury; failed to obtain Berk's informed consent prior to performing surgery on the knee; and caused Berk's wife to lose her husband's companionship as a result of the malpractice. Berk seeks damages in an unspecified amount.

St. Vincent's was voluntarily dismissed from the action with prejudice. The remaining defendants, UPO and Feldman (collectively, "Defendants"), each filed motions seeking either summary judgment on all claims pursuant to Fed.R.Civ.P. 56 or, in the alternative, partial summary judgment on all claims for past and future economic losses.

For the reasons discussed below, the Court grants Defendants' motions for summary judgment in their entirety. Defendants have made a proper initial showing pointing to an absence of a genuine dispute over any issues of material fact. The Court further determines that Berk has opposed the motion primarily with expert evidence of James Depuy, M.D. ("Depuy"), that does not put forward any admissible support for the conclusion that Feldman committed medical malpractice. Consequently, the Court finds that Berk has failed to establish any genuine issue as to facts material to his malpractice claim on the basis of admissible evidence. Berk has abandoned his informed consent claim, and Ellen Berk cannot prevail on her claim in the absence of malpractice.

## I. BACKGROUND

As many renowned jurists and scholars have long noted, the common law grows and spreads incrementally,[1] its principles

---

1. *See, e.g.,* Benjamin N. Cardozo, *The Growth* *of the Law* (1924); Benjamin N. Cardozo, *The*

surviving, and sometimes withering or perishing, much like the roots, buddings and branchings of a great family tree. It is in the tense mixture of innovation amid stability that the rule of law is rooted, the soil from which it derives its sustenance, endurance and strength. That evolution is often seeded by bold, novel or inspired strokes engendered in litigation or scholarship. Generally, what survives as validated norms emerges from legal theories the logic and reason of which compel by their power to command agreement and respect. Or else rules take hold by force of originality, sheer wisdom or common sense, or simply by virtue of time when the hour of a once legally unaccepted idea, however weathered and previously rejected, has finally come. Not unexpectedly, from the tension inherent in the measured cycles of the law, occasions arise when creative concepts urged by litigants upon the courts invite departures from recognized standards that, if judicially endorsed, would extend the natural ramification of legal doctrines not gradually, not by calibrated strides, but by leaps and bounds. The case before the Court presents an instance of such a requested thrust.

On its face, this controversy may appear to be just another medical malpractice dispute. In reality, beneath the routine pleadings and surface of the claims, the litigation raises far more vexing and profound issues elaborated below, questions of the kind that usually arise at the frontiers of the law and that test its elasticity and the outer limits of its development. It does so by means of some legal arguments Berk advances, for whatever judicial currency his thesis may fetch, as regards two familiar legal doctrines, both bulwarks of the law much tried and tested in myriad cases. One issue relates to the degree of solicitude and accommodation that a court must accord to the litigant opposing a summary judgment motion, in particular the length to which the court should go in drawing reasonable inferences, resolving ambiguities and viewing the facts at issue in the light most favorable to the non-moving party.[2] The second is the form and level of detail that the deposition testimony and report of a treating physician must encompass to qualify for admissibility as an expert medical opinion for summary judgment purposes.[3]

Creative and far-reaching as Berk's propositions may be, the Court is not persuaded that his endeavors to stretch the bounds of governing doctrine in these ar-

---

*Nature of the Judicial Process* (1921).

**2.** For the purpose of defeating summary judgment, Berk argues, as detailed in Section II. C.2. below, that the Court should enable him to proffer a case demonstrating genuine issues of material fact derived from a reconstruction of the record. This account of the facts would consist of certain portions of Berk's pleadings and deposition testimony favorable to his case, patched together with various selected pieces of helpful evidence from Defendants' version of events, while altogether disregarding the parts of his own statements incompatible with his claims, as well as the damaging aspects of defendants' evidence, that if admitted and credited would negate a finding of liability.

**3.** In this regard, Berk asks the Court to admit the testimony of Berk's treating physician as an expert witness for summary judgment purposes even if: the doctor has indicated that he had not been properly prepared for the case when he drafted the report containing his professional opinion; the facts and assumptions upon which the doctor formed his opinion are not based on any of the parties' account of events on the record; the doctor has indicated that he does not wish to appear at any further proceedings in connection with this case, and may be hostile if called; and Berk requests leave to put aside his physician's report and engage another medical expert for trial purposes if the action survives summary judgment.

eas of the law are warranted under applicable principles and controlling precedent. Thus, to this extent common law gradualism must prevail here in the final analysis, its triumph one of common sense surviving another onslaught of vigorous advocacy. Berk's theories perhaps may earn due accolade in what the jargon of law professors would label (sometimes with mixed intent) "elegant" or "intriguing." Nonetheless, the Court must reject the push, though not without conferring the judicial equivalent of a consolation prize: "Nice try."

## A. FACTS [4]

This action arises out of arthroscopic knee surgery that Feldman performed on Berk on January 18, 2002, and the infection that manifested itself in Berk's knee ten days after the surgery was performed. Among the peculiarities of this case is Berk's acknowledgment that no evidence supports the Complaint's allegations that Feldman performed the surgery itself in a negligent manner. Berk's Memorandum of Law, Rule 56.1 Statement, and proffered expert testimony focus exclusively on whether Feldman's purported statements during a telephone conversation that allegedly took place between Berk and Feldman several days after the surgery constituted medical malpractice. Berk's papers make no effort to sustain a *prima facie* case of malpractice based on the surgery itself, and Berk's special counsel, Brian T. Isaac ("Isaac") acknowledged at oral argument on Defendants' motions that Berk's informed consent claim was without support and would be withdrawn. (*See* Transcript of Hearing on July 18, 2005 ("Hr'g

Tr.") at 6.) Consequently, the discussion below will focus only on facts sufficient to explain the connection between Berk's alleged call to Feldman's office and Berk's injuries.

In late 2001, Berk was referred to Feldman, an orthopedic surgeon, to discuss the possibility of arthroscopic surgery on his left knee. Berk first met Feldman on January 3, 2002. On that day, Feldman prescribed an MRI to evaluate Berk's knee condition. The parties agree that because the MRI reflected a torn meniscus and other arthritic changes in Berk's knee, Berk followed Feldman's advice and decided that he would undergo arthroscopic surgery on the knee.

The surgery was performed on January 18, 2002. Berk returned to Feldman's office on January 22 for removal of the bandages and sutures that had been applied to Berk's knee after surgery. At the time of Berk's follow-up visit, the wound did not look unusual and did not present any sign of infection. On January 23, Berk flew to Florida, where, according to his deposition, until the morning of January 25 he performed limited physical activity such as driving, shopping and going to a restaurant.

The parties offer two substantially incompatible accounts of Berk's contact with Feldman's office on January 25. Berk testified that, on the morning of January 25, he noticed some odorless orange discharge around his knee wound, but experienced no pain or redness.[5] Berk stated that he then proceeded to clean the area where

4. The following factual summary derives from the parties' Rule 56.1 Statements, and from the expert affidavits, deposition transcripts, and other documents cited therein. Except where necessary, no further citation to these sources will be made.

5. *See* Deposition of Vincent Berk, dated January 30, 2004 ("Berk Dep."), attached as Ex. A to the Affidavit of Cheryl M. Wendt, dated Jan. 4, 2005 ("Wendt Aff."), at 145 ("When I woke up, I felt not necessarily sore, but I felt moistness on my leg."), 146 ("It didn't have an odor [to] me.").

the liquid was found and, around noon, called Feldman's office to inquire whether the orange liquid was a normal aspect of his post-operative recovery. On his first attempt, Berk was only able to reach Feldman's answering service and did not discuss the development of his knee condition with the operator. Thus, as of the time of Berk's initial call, there is no evidence that Feldman had reason to know what symptoms Berk was experiencing in Florida.

Berk testified that he made a second attempt to contact Feldman at around 2:30 p.m. on that same day. He stated at his deposition that, after introducing himself to an operator, he spoke personally to Feldman. He claimed he had the following conversation with Feldman: "He said what seems to be the problem? I said I had a pasty orange fluid coming out of my knee on the inside wound. I have no pain. It is not flowing like blood. What do you think the problem is? His response was it sounds like a knee fluid. I recommend that you ice and elevate your knee as much as possible for the rest of the day."[6] (Berk Dep. at 156.) Berk states that Feldman inquired about any unusual activity that Berk may have performed since their last meeting, but Berk replied that he had not done "anything out of the ordinary." (*Id.*) He further denied that Feldman had directed him to seek further medical attention. Thus, central to the parties' dispute and to the instant motions, Berk explicitly disclaimed that he had complained of redness, swelling, or pain in his post-operative knee during his conversation with Feldman on January 25.

This version of the conversation directly conflicts with the testimony provided by Defendants' witnesses. According to Feldman's assistant and receptionist, Carmen Carmona ("Carmona"), a licensed practical nurse who had been authorized by Feldman to answer patients' routine questions pursuant to instructions provided by him, Berk never spoke to Feldman during that phone call on January 25 and only spoke to her about his knee.[7] Contrary to Berk's testimony, Carmona testified that, according to her records and recollections, Berk complained of pain and possibly swelling in his post-operative knee, but no orange discharge. In response to Berk's complaint, Carmona recommended that Berk keep his knee dry, iced and elevated, and instructed Berk that, if pain and swelling continued, or if redness or any discharge appeared, he should seek medical attention at the nearest hospital emergency room. Her testimony is based on allegedly contemporaneous phone logs documenting Berk's call. Feldman does not recall speaking with Berk on January 25.[8]

Berk testified that, following what he alleges was Feldman's advice, he rested and iced his knee from around 2:30 until around 7:30 p.m. on January 25. Berk claimed that his knee continued to produce orange fluid, but that the flow of the orange fluid decreased from January 26 until the morning of January 28. Berk denied feeling any pain or experiencing any other symptoms in his left knee at any time between January 25 and January 27. He never called Feldman's office, nor did he seek any medical attention, at any time during January 26 or 27. Berk returned by plane from Florida on his way back to

---

6. The parties' experts have stated that this orange substance consisted of "synovial fluid," which acts as a lubricant within the knee, along with some blood mixed in. (*See, e.g.,* Affidavit of Noah S. Finkel, dated Dec. 3, 2004 ("Finkel Aff."), ¶ 10.)

7. *See* Deposition of Carmen Carmona, dated March 24, 2004 ("Carmona Dep."), attached as Ex. B to Wendt Aff., at 47.

8. *See* Deposition of Andrew Feldman, M.D., dated Mar. 3, 2004 ("Feldman Dep."), attached as Ex. E to Wendt Aff., at 170–71.

his home in Connecticut in the evening of January 27.

Berk commuted to New York on the morning of January 28 to resume work. After feeling intense pain in his left knee, Berk was forced to leave the office around lunchtime and return home to Connecticut. Berk did not call Feldman's office to report this development or request medical advice. Upon observing what he described as "ugly, gray, putrid pus" coming from his knee later in the evening of that same day (Berk Dep. at 169), Berk sought immediate orthopedic care at Danbury Hospital, where he was later diagnosed with a septic knee due to a *staph aureus* infection. During his hospitalization at Danbury Hospital, Depuy, an orthopedic surgeon based at the hospital, or his medical associates performed four surgical procedures on Berk's knee.[9] In an expert report, which was prepared in letter form addressed to a paralegal of Berk's counsel and attached to Defendants' moving papers but not to Berk's, Depuy asserts that the procedures were necessary to clean up the infection.[10] In addition, Berk received intravenous antibiotic therapy at the recommendation of an infectious disease specialist at Danbury Hospital. Depuy alleges that, as a consequence of the infection,

Berk "suffers degenerative changes in the left knee ... [and] will need a total knee replacement in the future."[11] (Depuy Report at 2–3.)

## B. *PROCEDURAL HISTORY*

This action was pending for almost eighteen months before Defendants filed summary judgment motions, in large part due to discovery disputes and related delays. On September 17, 2004, the Court referred several discovery disputes to Magistrate Judge Dolinger. One dispute was caused by Depuy's refusal to appear for his deposition. On October 24, 2004, Depuy was finally deposed as a fact witness pursuant to a subpoena. Pursuant to Magistrate Judge Dolinger's order, Depuy was also directed to answer questions seeking expert testimony, but remained free to seek compensation at a reasonable rate set by the Court. In addition, on November 15, 2004, Magistrate Judge Dolinger ordered that Berk, having failed to provide an expert report from his designated economist in a timely fashion, was precluded from presenting such expert testimony at trial.

Both Feldman and UPO have moved for summary judgment with respect to all claims, or, in the alternative, partial sum-

---

9. *See* Deposition of James Depuy, M.D., dated October 27, 2004 ("Depuy Dep."), attached as Ex. I to Wendt Aff., at 19–20.

10. *See* Letter from James Depuy, M.D. to Debbie Pagan, dated August 18, 2004 ("Depuy Report"), attached as Ex. H to Wendt Aff., at 1–2.

11. Defendants' experts assert that the multiple procedures performed on Berk by Depuy, and the permanent injuries sustained by Berk's knee, were caused by Depuy's *own* medical malpractice. According to these experts, Depuy could have avoided performing multiple procedures on Berk, and could have drained the infected fluid from his knee, by following proper standards of care. If Depuy had treated Berk properly, these experts

claim, Berk would not have sustained any permanent damage to his knee. (*See, e.g.,* Expert Report of Stuart I. Springer, M.D., dated October 7, 2004 ("Springer Report"), attached as Ex. H to Declaration of Michael J. Laub, dated Dec. 9, 2004 ("Laub Decl."), at 2 ("It is therefore my opinion with a reasonable degree of medical certainty that the further deterioration of Mr. Berk's left knee joint is directly the result of Dr. DePuy's [sic] inability to control the infection, requiring four procedures in a short span of time when usually one good debridement and lavage would have been sufficient.").) Because allegations of Depuy's malpractice are not directly relevant to Defendants' motions, however, the Court does not explore this theory of causation further.

mary judgment with regards to any claims arising from lost present and future earnings.[12] Defendants' motion papers claim that Feldman did not commit medical malpractice under any party's version of the telephone conversation that took place between Berk and Feldman's office on January 25. In support of their argument, Defendants have submitted reports and affidavits from four experts, two orthopedic surgeons and two infectious disease specialists, all of whom conclude that the advice provided by Feldman's office to Berk did not constitute medical malpractice or cause Berk's injuries. The experts' Curricula Vitae, which establish their extensive training and experience in their respective fields, are attached to the experts' submissions.

Defendants' motion papers further contend that some or all of Depuy's testimony should be excluded on several grounds. First, Defendants argue that Depuy's testimony does not meet several of the requirements of Fed.R.Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which established legal standards governing the admissibility of expert testimony. Second, Defendants allege that Depuy's expert report should be excluded for failure to comply with Fed.R.Civ.P. 26(a)(2)(B), which requires most expert witnesses to submit detailed reports explaining their qualifications and specific bases for their conclusions drawn from "scientific, technical, or other specialized knowledge." Fed.R.Evid. 702.

Further issues related to Depuy's expert testimony developed following submission of Defendants' motion papers. In affirmations attached to Berk's opposition to summary judgment, two of Berk's attorneys announced that a pre-existing dispute between Depuy, Berk, and Berk's counsel over monies and fees, as well as Depuy's belief that he was not properly prepared for the case, prevented Depuy from signing an affidavit proposed to him by Berk's counsel for submission on summary judgment.[13] That affidavit was allegedly sought to explain discrepancies between the assumptions on which Depuy's expert report and testimony were based and Berk's own deposition testimony. Moreover, Isaac asks that, should Defendants' motion be denied, this Court grant leave to secure a new expert to replace Depuy. (Isaac Aff. at 2.)

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Fed.R.Civ.P. 56(c) authorizes the granting of summary judgment when the evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

**12.** Defendants allege that since Berk, formerly a securities trader and industry executive, received a censure and permanent bar from working for any member of the New York Stock Exchange due to his failure to cooperate with an investigation into securities fraud at the firm that he led, *see In re Vincent J. Berk*, Exchange Hearing Panel Decision 03–16 (Feb. 20, 2003), attached as Ex. N to Wendt Aff., he should not be able to demonstrate lost earnings without testimony from an expert who could explain Berk's new, and presumably lower, earning capacity. Berk is without an economic expert following Magistrate Judge Dolinger's imposition of discovery sanctions for this failure to comply with discovery deadlines. Because the Court concludes that Defendants are entitled to summary judgment, however, it does not decide whether Berk could claim lost earnings as a category of damages without the benefit of expert testimony.

**13.** *See* Plaintiffs' Memorandum of Law, dated Jan. 26, 2005 ("Plaintiffs' Mem."), at 18–19; Affirmation of Brian Isaac ("Isaac Aff."), dated Jan. 26, 2005, attached as Ex. B to Berk Mem., at 2–3; Affirmation of Cristopher Crawford ("Crawford Aff."), dated Jan. 26, 2005, attached as Ex. C to Berk Mem., at 1–2.

matter of law." A fact is material if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The party moving for summary judgment bears the initial burden of showing the absence of a genuine dispute over any issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a showing, the burden shifts to the non-moving party to provide evidence of "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). At this stage of the proceedings, the non-moving party may not rest on "mere allegations or denials," Fed.R.Civ.P. 56(e), of the movant's claims or "on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir.2003). "That does not mean, however, that a party can successfully oppose summary judgment on the basis of an unreasonable view of the facts." *Edwards v. Akzko Nobel,* 193 F.Supp.2d 680, 688 (W.D.N.Y.2001); *cf. County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1318 (2d Cir.1990) ("In determining what may reasonably be inferred from [a witness's] testimony, [the non-moving party] 'is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts.'") (quoting *Lewis v. Nelson,* 277 F.2d 207, 210 (8th Cir.1960)).

## B. *ELEMENTS OF A MEDICAL MALPRACTICE CLAIM*

■ To determine what facts are "material" to Berk's medical malpractice claim and the role of expert testimony in proving that claim, the Court briefly reviews the substantive law of medical malpractice in New York.[14] It is well settled under New York law that "[t]he requisite elements of proof in a medical malpractice case are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Amsler v. Verrilli,* 119 A.D.2d 786, 501 N.Y.S.2d 411, 411 (2d Dep't 1986). As the Second Circuit has noted of New York malpractice law, "[i]n order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." *Sitts v. United States,* 811 F.2d 736, 739–40 (2d Cir.1987) (citing *Toth v. Community Hospital at Glen Cove,* 22 N.Y.2d 255, 292

**14.** The parties do not dispute that New York law of medical malpractice applies to Berk's claims against Defendants. It appears clear that Berk's surgery was performed in New York, and that Feldman's office conveyed medical advice to Berk on January 25, 2002, from New York. The Court thus does not examine the extent to which Connecticut law would apply the legal standards relevant to Depuy's treatment of Berk at Danbury Hospital.

N.Y.S.2d 440, 239 N.E.2d 368, 372 (1968); *Monahan v. Weichert*, 82 A.D.2d 102, 442 N.Y.S.2d 295, 297 (4th Dep't 1981)).

■ Expert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries. As the Second Circuit concluded in *Sitts*, "[i]t is well established in New York law that 'unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" *Sitts*, 811 F.2d at 739 (quoting *Keane v. Sloan–Kettering Institute for Cancer Research*, 96 A.D.2d 505, 464 N.Y.S.2d 548, 549 (2d Dep't 1983)). Moreover, "[e]ven where it might initially appear that the matter would be within the trier's ordinary competence, ... if the defendant can proffer any evidence to support the view that a proper standard of care was followed, the plaintiff cannot prevail without introducing expert medical testimony." *Id.* at 740 (citing *Benson v. Dean*, 232 N.Y. 52, 133 N.E. 125, 127 (1921)).

■ Applying this standard to the instant case, it is apparent that Depuy's proffered testimony is central to Berk's medical malpractice claim for two reasons. First, Berk does not allege, and could not demonstrate, that Feldman's alleged act of malpractice "falls within the competence of a lay jury to evaluate." Expert testimony is necessary to determine whether the alleged advice given to Berk over the telephone on January 25, 2002 by or on behalf of Feldman departed from the standard of practice of the orthopedic surgery profession, and further whether that alleged departure was the proximate cause of the staph infection to which Berk's injuries are attributed in his complaint. *Compare, e.g., Wenger v. Mollin*, 264 N.Y. 656, 191 N.E. 611 (1934) (holding that a dentist who had accidentally extracted a healthy tooth instead of the tooth that required care could be shown to be negligent without expert testimony). Depuy served as Berk's only expert on both elements of his malpractice claim. Thus, without Depuy's professional opinion concerning Defendants' adherence to the applicable standard of care and proximate causation, Berk could not make out a *prima facie* case of medical malpractice that could survive summary judgment.

Second, even if Depuy's expert testimony were not required to establish a *prima facie* case of medical malpractice, Berk could not rebut Defendants' four expert reports without proffering expert medical opinion.

## C. ANALYSIS

### 1. The Relevant Standard of Practice

■ The Court begins its analysis of Berk's claims by articulating what all of the parties appear to agree is the relevant standard of practice in the orthopedic surgery profession: an orthopedic surgeon who receives a phone call from a patient complaining of symptoms presenting evidence of infection should direct that patient to seek further medical attention.[15] All of the parties and their experts appear to agree that the applicable standard of practice requires that a patient complaining of swelling, redness, *and* orange drainage should be directed to seek further medical attention.[16] Defendants' experts

---

15. *See, e.g.*, Expert Report of Alan N. Pollock, M.D., dated Oct. 10, 2004 ("Pollock Report"), attached as Ex. A to Affidavit of Alan N. Pollock, M.D., dated Jan. 3, 2005 ("Pollock Aff."), at 2.

16. *See, e.g.*, Affidavit of Bruce Farber, M.D., dated Dec. 8, 2004 ("Farber Aff."), attached as Ex. I to Laub Decl., ¶ 24 ("Orange discharge, in and of itself, *absent such factors* as

also acknowledge that prolonged pain and swelling, even without orange drainage, could present evidence of infection; they state that Carmona properly instructed Berk to seek further medical attention if his alleged pain and swelling continued.[17] With the exception of a single statement made by Depuy at his deposition, however, none of the parties or their experts contends that orange drainage alone, the lone symptom that Berk said he complained of during his conversation with Feldman on January 25, presents a sufficient sign of infection requiring further medical attention.

### 2. Berk's Version of Events

In an attempt to avoid the implications of his deposition testimony, Berk, in his opposition papers and at oral argument, develops a version of the facts that Defendants characterize as a pick and choose "one from column A and one from column B" Chinese menu approach to summary judgment review. (Hr'g Tr. at 15.) In essence, Berk's counsel seeks to splice together fundamentally inconsistent aspects of Berk's and Carmona's testimony into a story that would, if proven, establish that Feldman deviated from the relevant standard of practice. To this end, regarding the symptoms that Berk complained of, Berk asks the Court to accept as true, for

the purposes of the instant motion, the portions of Carmona's deposition indicating that Berk had complained of pain and swelling and to piece that testimony together with the statement in Berk's deposition indicating that it was Feldman to whom he had complained of orange drainage. At the same time, Berk urges that the Court disregard the implicitly contradictory elements of his own sworn deposition testimony stating that he complained to Feldman only of a discharge of orange fluid from his knee, specifically denying pain, and not mentioning to Feldman any redness, swelling, or other symptoms. To find evidence of pain and swelling in the record, the Court is also called upon to set aside Berk's sworn statement that he talked to Feldman, and instead turn to and accept *Carmona*'s statement that Berk described pain and swelling (but not discharge) in his conversation with *her*.

Berk's theory then further appears to invite the Court to reverse its method in reading the evidence, and do the opposite when assessing what advice Berk received at the time he complained of these symptoms. In reviewing this part of the record, under Berk's approach the Court would have to adopt Berk's assertion that it was Feldman he spoke with and who failed to advise him to seek further medical attention. For this purpose Berk therefore

---

redness, fever, chills, progressive swelling and pain, and absent purulence (*pus*), is not evidence of infection.... Because there was no evidence of an infection, there was no need for emergent care, such as Mr. Berk being seen immediately by a physician."); Depuy Report at 2–3 ("When Berk complained of increased swelling, redness and drainage approximately five days post-operatively in a call to Dr. Feldman's office, he should have been instructed to seek immediate medical attention. The complaints he had were significant and presented a strong probability of infection."). The Court quotes from Depuy's expert report to indicate that, if the contents of his expert report were credited on sum-

mary judgment, *see infra* (concluding that the expert report is inadmissible on summary judgment), it would tend to establish that a party complaining of increased swelling, redness, and drainage presents symptoms of infection requiring immediate medical attention.

17. *See, e.g.,* Pollock Report at 4 ("The recommendation [by Carmona] to elevate the knee, apply ice, seek medical attention if pain and swelling continued, or if redness or discharge appeared was correct and reasonable advice and demonstrated awareness of the *potential* for the development of a wound infection.").

presses the Court to discredit the portions of Carmona's sworn testimony stating that Berk was told to seek immediate medical attention if pain and swelling continued, or if discharge developed along with the pain and swelling.[18]

Berk's counsel, at oral argument, made clear that this strategy was central to Berk's case, stating: "If my adversary is correct that in a summary judgment motion you don't, to use my adversary's words, pick and choose, you can throw me out of court right now because I'm picking and choosing. That's exactly what I'm asking you to do." (Hr'g Tr. at 25–26.)

■ The Court strongly disagrees with what Berk acknowledges to be a "pick and choose" summary judgment procedure. The law is clear that while in this context the Court must view the facts in the light most favorable to Berk as the non-movant, as well as resolve ambiguities and draw all "reasonable inferences" against the movants, this solicitude does not mean that Berk can withstand summary judgment "on the basis of an unreasonable view of the facts." *Edwards,* 193 F.Supp.2d at 688.

■ The Court views Berk's effort to create a hybrid account of events that accords with no witness's version of the evidence as putting forward a view of the facts that is patently unreasonable and that should therefore not be credited on summary judgment. The methodological gyrations and reversals Berk's notion would demand the Court to perform in viewing the evidence, as manifest from the recitation above, produces a tortured reconstruction of facts not fully supported by any consistent statement of the evidence. The conceptual impracticalities of this course almost speak for themselves. It places the Court in an unwarranted and untenable position.

Essentially, Berk's proposition urges the Court to craft a viable case for the non-movant from conveniently selected pieces of evidence helpful to him. To piece together this judicial cut-and-paste edition of the record, the Court would have to discredit a plaintiff's own sworn account of critical facts and selectively substitute contrary testimony of defendants' witnesses to sustain the plaintiff's theory of liability.[19]

---

18. The Court states that Berk "apparently" argues that the Court must accept Berk's statements concerning the instructions he received from Feldman's assistant because Isaac, Berk's special counsel, suggested at oral argument that Feldman could be held liable even if Feldman or Carmona *had* told Berk to seek further medical attention when he called. When asked by the Court whether it would need to discredit the portion of Carmona's testimony that stated she instructed Berk to seek medical attention under various circumstances in order to deny Defendants' summary judgment motions, Isaac replied: "They have a great comparative negligence case. They can argue that at trial. That's comparative negligence, has nothing to do with duty.... And I never said they didn't have a comparative negligence defense. They can argue he should have gone right away. His condition would have been ameliorated." (Hr'g Tr. at 28.)

This argument fundamentally misunderstands the nature of Berk's claim. Feldman cannot be held liable for malpractice unless he, either directly or through his agent Carmona, violated the relevant standard of practice, which requires a physician to recommend further medical treatment to a patient if a patient complains of symptoms presenting evidence of infection. Feldman could not have violated this standard of practice if the record establishes that Berk *was* told to seek further medical care when he called Feldman's office, whether or not Berk actually followed Feldman's advice.

19. Berk's attempt to create a genuine issue for trial by asking the Court to selectively disregard his prior sworn testimony and selectively credit directly contradictory testimony of his adversaries is analogous to other situations in which non-moving parties have attempted to create an issue for trial by submitting materials that contradict their previous sworn statements. The Supreme Court has noted that, under these circumstances, lower courts have "held with virtual unanimi-

Not the least of the hitches inherent in this approach is its failure to account for the appropriateness of summary judgment where no rational trier of fact could find for the non-moving party. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Berk fails to explain how, if the record, such as it is, were introduced to a factfinder at trial, he would be able to sustain his burden of proof by relying on selected pieces of Defendants' testimony while somehow excluding from the. factfinder's consideration not only the remaining, unfavorable parts of that same evidence, but Berk's own statements incompatible with his theory of recovery.

The Court will discharge its duty on summary judgment by drawing reasonable inferences and resolving all ambiguities in favor of Berk in the manner contemplated by the Federal Rules of Civil Procedure: by disregarding Defendants' evidence indicating that Berk received proper medical advice when he complained to Feldman's office of pain and swelling. The Court will also credit Berk's own sworn deposition testimony setting forth his version of events to determine whether summary judgment would be appropriate. The Court finds pertinent support for this approach in a recent case from the Eleventh Circuit. Confronted with a similar effort by a nonmoving party to manipulate the factual record for purposes of avoiding summary judgment, the Court rejected the "pick and choose" standard, stating:

> [W]e accept the nonmovant's version of the events when reviewing a decision on summary judgment. When the nonmovant has testified to events, *we do not* (as urged by Plaintiffs' counsel) *pick and choose from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony ) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.* Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided.

*Evans v. Stephens,* 407 F.3d 1272, 1278 (11th Cir.2005) (en banc) (emphasis added, footnote omitted).

### 3. *Defendants' Prima Facie Entitlement to Summary Judgment*

Crediting Berk's version of the facts, the Court concludes. that on January 25, Berk complained to Feldman of orange dis-

---

ty that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The Court sees no reason why this principle should not also apply here: Berk has made sworn statements at his deposition that are harmful to his case, and he has given no reason why the Court should selectively disregard the portions of Berk's statements that are prejudicial and credit those that are favorable, and to undo the damage by filling in the detrimental gaps with similarly convenient parts of Defendants' account. While "a party's deposition testimony as to a given fact does not foreclose a trial or an evidentiary hearing where that testimony is contradicted by evidence other than the deponent's subsequent affidavit," *Palazzo ex rel. Delmage v. Corio,* 232 F.3d 38, 43 (2d Cir.2000), the mere presence of contradictory testimony does not *establish* the existence of a genuine issue for trial where the conflicting testimony, even if credited by the Court, would nonetheless fail to establish Defendants' liability.

charge, but not of pain, swelling, or redness. Feldman then instructed Berk to ice and elevate the knee for the rest of the day, but did not inform Berk at that time that he needed to seek further medical attention. Berk did not call Feldman again until he had been admitted to Danbury Hospital with a staph infection, even though he stated that the drainage continued for some time thereafter into January 26 and 27.

All of Defendants' expert reports and affidavits state that Feldman's alleged advice to Berk was entirely appropriate: according to the experts, the drainage of orange fluid from a post-operative wound is not unusual where the patient has engaged in physical activity, as Berk admitted to doing on the day before the discharge began.[20] Moreover, according to these experts, fluid discharge from a post-operative wound presents no evidence of infection in the absence of other symptoms such as pain, swelling, or redness.

Defendants also argue, with the assistance of their infectious disease experts,

that Feldman's advice to Berk could not have served as a proximate cause of the staph infection from which Berk's injuries later derived because staph infections develop within a matter of hours, rather than days. Moreover, they point out that the most common initial symptoms of staph infection include swelling, redness, fever and pain, symptoms which Berk presumably would have complained of to Feldman, but which by his own admission he did not report having felt. Defendants contend that if Berk did not have any indication of a staph infection on January 25 when Berk allegedly spoke with Feldman, he must have contracted it much later, in the hours preceding the onset of the pain he experienced on January 28 that forced him to return home from work and to seek medical attention. Thus, Defendants contend that they cannot be held liable for injuries resulting from that infection.[21]

Consequently, the Court concludes that Defendants have established their *prima facie* entitlement to summary judgment unless Berk can come forward with admis-

---

**20.** *See, e.g.,* Finkel Aff. ¶ 10 ("It is my opinion that the orange drainage, which is a combination of the normal synovial fluid with some blood mixed in, is certainly expected after arthroscopic surgery and is not indicative of an infection."); Pollack Aff. ¶¶ 15 ("the initial observation of 'orange' fluid on January 25, 2002 is not indicative of pus [*i.e.,* infection] because the composition of pus, white blood cells, bacteria, fibrin, and cellular debris, produce a grey-yellow color not orange"), 19 ("Mr. Berk developed non-infected wound drainage after physical activity."); Springer Aff. ¶ 24 ("Orange discharge, as described by Mr. Berk, in and of itself, is consistent with non-infectious synovial fluid."); Farber Aff. ¶ 24 ("Orange discharge, in and of itself, absent such factors as redness, fever, chills, progressive swelling and pain, and absent purulence (*pus*), is not evidence of an infection, including either a superficial infection or a deep knee infection.... Under these circumstances, Mr. Berk's complaint was compatible with sterile synovial fluid.").

**21.** As Isaac noted and as Defendants acknowledged at oral argument (*see* Hr'g Tr. at 10–11, 24–25), at least one of Defendants' experts opines that the effusion of synovial fluid may have been at least a "but for" cause of Berk's infection. (*See* Finkel Aff. ¶ 13 ("It is further my opinion that the orange drainage functioned as a conduit from the exterior where the normal pathogenic bacteria in our environment likely colonized the gauze and then followed the fluid into the knee, creating an acute process within the knee.").) Defendants' experts do not, however, support the conclusion that Feldman committed malpractice by failing to direct Berk to go to the hospital immediately when Berk complained of orange drainage: if Berk's knee presented no sign of infection on January 25, it is unclear from the record what a physician examining Berk's knee on that date could have done to avoid the staph infection that ultimately may have developed on January 28.

sible expert evidence that would rebut a finding that the treatment rendered by Feldman was not negligent. *See Sitts*, 811 F.2d at 740.

### 4. *Berk's Proffered Expert Testimony*

As indicated above, Berk has had what appears to be an irremediable disagreement with Depuy, his sole expert, "over monies and fees as well as his involvement with the case." (Isaac Aff. at 2.) Berk's attorneys were apparently told by Depuy, upon presenting an affidavit to him for his signature, that "he wanted his fees paid, that the affidavit was factually inaccurate, and that he had not been prepared properly for this case. We asked the doctor to send us the comments or corrections he had to the draft, but he refused, asserting that he wanted us to travel to Danbury, Connecticut to 'dissect' various deposition transcripts." (Crawford Aff. at 2.) Berk's counsel further indicated at oral argument that it was "extremely unlikely" that Berk would be able to "get Dr. Depuy as a witness," and that he believed that "we cannot secure his cooperation" at trial. (Hr'g Tr. at 11.) When asked by the Court why it should consider Depuy's testimony in opposition to Defendants' summary judgment motions when Berk himself has expressed his desire to not call Depuy at trial, Berk's counsel stated: "It's an absolutely justified concern. And my response to you is that we can subpoena him. I have no idea how that case would go. I assume it would go very, very badly. And that's why we asked in our motion for leave to secure another expert." (*Id.* at 14.)

Berk is nonetheless relying on Depuy's testimony in order to defeat summary judgment.[22] He does seek to substitute Depuy with another expert, but "only in the event the within [summary judgment] motion is denied." (Isaac Aff. at 2.) Berk has submitted no supplemental expert testimony from Depuy, presumably for the reasons conveyed in counsel's statements to the Court, and has not sought to identify or introduce testimony from a new expert who could support Berk's malpractice claim. Nor has Berk moved to have the Court's consideration of Defendants' summary judgment motion delayed while he obtains new expert testimony. *See* Fed. R.Civ.P. 56(f) (providing for a procedure by which the Court "may order a continuance [in consideration of a summary judgment motion] to permit affidavits to be obtained or depositions to be taken or discovery to be had").[23] Consequently, Berk's opposition to summary judgment

---

**22.** At oral argument, Berk's counsel acknowledged that "[i]t's very, very difficult to make out a prima facie case on the deposition testimony of other parties alone," but then asserted: "it seems to me there is a fragmentation or dichotomy between the summary judgment motion, which is addressed to the facial sufficiency of the claims where the defendant has the burden of proof and the burden of proof at trial, where the plaintiff has the burden of proving the case by the preponderance of the evidence." Counsel gave no indication, however, that he would be able to make out a *prima facie* claim of malpractice on the basis of the materials submitted by Defendants' experts. The Court, on independent review of Defendants' expert evidence, can find nothing in Defendants' papers that would support the conclusion that Feldman's alleged advice to Berk constituted malpractice or caused Berk's injuries. Consequently, Depuy's testimony is central to Berk's malpractice claim.

**23.** The Court must note that at this stage of the proceedings, and given the posture of the case and the manifest prejudice that would be caused by the granting of any additional discovery, Berk would face an exceedingly heavy burden to obtain leave for such a delay. Insofar as Berk's statements at oral argument or in the papers he submitted in connection with the instant motion may be construed as a motion for further discovery, the Court finds that authorizing the delay would be inequitable and thus denies the request.

must rest on Depuy's preexisting testimony, to the extent it may be considered by the Court.

■ While the Court will not categorically exclude Depuy's entire testimony from consideration on the instant motion, it will scrutinize its admissibility in light of indications that the evidence lacks the reliability necessary for it to be admissible as expert testimony to defeat Defendants' motions. Even if Depuy is an uncooperative witness, he may be subpoenaed to testify as a fact witness concerning the treatment he gave to Berk, and may also be compelled to relate his earlier expert findings at a trial in this matter. *See Gilly v. City of New York,* 69 N.Y.2d 509, 516 N.Y.S.2d 166, 508 N.E.2d 901, 902 (1987) (per curiam) (concluding that a non-party expert physician who had earlier prepared an expert report could be compelled "to relate conclusions already formulated and fully disclosed"). Berk thus may, for the purposes of the instant motion, assert that he will subpoena Depuy to put the elements of his preexisting expert report and deposition testimony before the jury. The Court will not, however, allow testimony that fails to satisfy the admissibility requirements of Fed.R.Evid. 702 and *Daubert* to be considered on summary judgment. *See Lippe v. Bairnco Corp.,* 249 F.Supp.2d 357, 385–86 (S.D.N.Y.2003); *Colon ex rel. Molina v. BIC USA, Inc.,* 199 F.Supp.2d 53, 68 (S.D.N.Y.2001) ("If a proffer of expert testimony is excluded as inadmissible pursuant to [Fed.R.Evid.] 702, the court must make the summary judgment determination on a record that does not include that evidence.").

a. *Admissibility of Expert Testimony under Daubert*

■ As described by *Lippe, Colon,* and numerous other court rulings, the proponent of expert testimony bears the burden of proving its admissibility. *See Colon,*

199 F.Supp.2d at 69 ("The proponent of the evidence must establish admissibility under [Federal] Rule [of Evidence] 104(a) by a preponderance of the proof."). Fed. R.Evid. 702 supplies the relevant standards that proffered expert testimony must meet in order to be admissible. *See Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir.2005) ("The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence."). Rule 702 states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

While Rule 702 adopted a more liberal standard of admissibility for expert opinions than the earlier common-law standard governing the admissibility of expert testimony, it "did not represent an abdication of the screening function traditionally played by trial judges" with respect to expert testimony. *Nimely,* 414 F.3d 381, 395.

As interpreted by courts, Rule 702 lays out a three-step inquiry to determine whether testimony by a party's expert should be deemed admissible. First, a court must investigate the expert's compliance with the provision of Fed.R.Evid. 702 that requires an expert to be "qualified as an expert by knowledge, skill, experience, training or education." As *Nimely* noted, "[t]he initial question of whether a witness is qualified to be an 'expert' is important,

among other reasons, because an 'expert' witness is permitted substantially more leeway than 'lay witnesses in testifying as to opinions that are not rationally based on [his or her] perception.'" *Nimely,* 414 F.3d 381, 395 n. 11 (quoting *United States v. Garcia,* 291 F.3d 127, 139 & n. 8 (2d Cir.2002)).

Second, the Court must analyze the "first prong of the *Daubert* inquiry by evaluating [the expert's] methodology or reasoning leading to his conclusions" through the prism of the non-exhaustive four-factor list in *Daubert.* *Colon,* 199 F.Supp.2d at 72 (citing *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786). This inquiry tests "whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been or could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely,* 414 F.3d 381, 396 (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786).

In engaging in this evaluation, the Court must examine not only the validity of the expert's methodology, but also the analytical connection between the application of the expert's proffered theory to the facts at issue in the case. *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. As *Nimely* explains:

[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions. *"[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.* A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S.

136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Thus, we have previously stated that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos [v. National R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir.2002) ].

*Nimely,* 414 F.3d 381, 396 (emphasis added).

Third, the Court must review the relevance of the proposed expert's testimony to determine whether the conclusions it draws will aid the factfinder in answering the questions at issue in the case. *See Colon,* 199 F.Supp.2d at 72 ("As a third and final step in determining whether expert testimony is admissible, courts apply the second prong of *Daubert* which tests any reliable testimony for fitness, or relevance, to the question(s) at hand.").

■ The Second Circuit has explained that it is proper for district courts to screen out inadmissible expert testimony on summary judgment:

Because the purpose of summary judgment is to weed out cases in which "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, questions of admissibility are properly resolved by the court. The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury.

Under *Daubert* [ ], the district court functions as the gatekeeper for expert testimony. The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment.

*Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) (internal citations and footnotes omitted). This is true even if the exclusion of expert testimony would be outcome-determinative. *See General Electric Co.,* 522 U.S. at 142–43, 118 S.Ct. 512 (rejecting "[the] argument that because the granting of summary judgment in [a] case [may be] 'outcome determinative,' [the exclusion of expert testimony] should [be] subjected to a more searching standard of review").

██ District courts have broad discretion in determining how to ascertain whether proffered expert testimony is admissible. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable.") (emphasis in original). Fed.R.Evid. 104(a) authorizes district courts to conduct pretrial evidentiary hearings in order to ascertain the admissibility of expert testimony; these proceedings are often called *Daubert* hearings. While, "in general, Rule 104(a) pretrial evidentiary hearings are 'highly desirable' because they allow parties to present expert evidence and conduct cross-examination of the proposed expert," *Colon,* 199 F.Supp.2d at 69 (quoting *Borawick v. Shay,* 68 F.3d 597, 608 (2d Cir.1995)), "[n]othing in *Daubert,* or any other Supreme Court or Second Circuit case, mandates that the district hold a *Daubert* hearing before ruling on the admissibility of expert testimony, even when such ruling

is dispositive of a summary judgment motion." *Id.* at 71.

██ The Court will not hold further proceedings before addressing the admissibility of Depuy's testimony in this case. Berk was fully aware of the substance of Defendants' *Daubert* challenge to the admissibility of Depuy's testimony at the time he submitted briefing opposing summary judgment, but did not submit any information from Depuy (presumably for the reasons stated in the attorneys' affirmations), or from any other third-party medical expert or medical literature (for reasons unexplained by Berk or his counsel), countering Defendants' challenge. *Cf. Lujan v. National Wildlife Federation,* 497 U.S. 871, 897, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[A] litigant's failure to buttress its position because of confidence in the strength of that position is always indulged in at the litigant's own risk."). Berk has further made clear that he expects Depuy to be a hostile witness if Depuy were compelled by subpoena to attend any further proceedings related to this case, and has asked that Depuy be replaced if the evidence now in the record enables Berk to survive summary judgment. In addition, no party has sought a *Daubert* hearing or contended that it would facilitate the Court's resolution of Defendants' challenge to Depuy's expert testimony. Under these unusual circumstances, additional proceedings are unnecessary to address the issues raised by Defendants' *Daubert* challenge.

b. *Application of Daubert to Depuy's Testimony*

Defendants have focused their challenge on the reliability prong of *Daubert.* They allege that Depuy's application of his methodology, to the extent he has one, to the facts of this case is unreliable in several respects. They note that Depuy based his conclusion that Berk should have been

told to seek immediate medical attention on the assumption that Berk complained to Feldman of "increased swelling, redness and drainage," when in fact, Berk himself testified at his deposition that he complained only of drainage when he spoke to Feldman. Defendants point out several other inaccuracies in Depuy's expert report, including errors describing the dates on which Berk's symptoms appeared and on which Berk allegedly contacted Feldman. (*See, e.g.,* Feldman Mem. at 6–7.) Defendants also seek to exclude the portion of Depuy's deposition testimony in which he concluded, in response to a hypothetical question, that any time fluid flows from a post-operative wound, "it's indicative of infection, period." (Depuy Dep. at 52.)

Even assuming that Depuy were qualified to testify about the causation of Berk's injuries,[24] the elements of his expert report and deposition testimony concluding that Feldman departed from the applicable standard of care fail the *Daubert* reliability test.

The Court turns first to the statement in Depuy's expert report, which is offered in the form of a letter addressed to a parale-gal of Berk's counsel, concluding that Feldman committed medical malpractice. In his expert report, Depuy asserts:

> When Mr. Berk complained of increased swelling, redness and drainage approximately five days post-operatively in a telephone call to Dr. Feldman's office, he should have been instructed to seek immediate medical attention. The complaints he had were significant and presented a strong probability of infection. Instead, Mr. Berk was merely informed to ice and elevate his left leg. He was not informed to seek medical attention. The advice he was given constituted a deviation of the standard of care.

(Depuy Report at 2–3.)

 The report suffers from several flaws, not the least of which is that it is inadmissible on summary judgment. Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R.Civ.P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support. *See, e.g., Brazier v. Hasbro, Inc.,* No. 99 Civ. 11258, 2004 WL 1497607, at *2 (S.D.N.Y. July 6, 2004) ("The submission of unsworn letters

---

**24.** The Court notes that it is far from certain that Depuy is qualified to testify as to the causation of the *staph aureus* infection that allegedly caused Berk's injuries. Defendants have presented testimony from two infectious disease specialists indicating that the staph infection could not have been present at the time that Berk allegedly spoke with Feldman on January 25, 2002. Depuy himself relied on infectious disease experts to diagnose and treat Berk's infection, indicating that he himself may not be sufficiently expert in the field of infectious diseases, and Depuy has provided no information to the Court on any unique training or qualifications that he might have to opine on the causation of Berk's staph infection. As the Second Circuit noted in *Nimely,* "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opin-ions as to other fields." *Nimely,* 414 F.3d 381, 398–99. n. 13 (citing *United States v. Roldan–Zapata,* 916 F.2d 795, 805 (2d Cir. 1990)).

However, because the Second Circuit has generally permitted treating physicians to testify concerning the causation of their patients' injuries based on their background and specialized experience, *see, e.g., McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995); *Santoro v. Signature Const., Inc.,* No. 00 Civ. 4595, 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002), and because Defendants have not pointed to any specific flaws in Depuy's capacity to opine concerning the causation of a knee infection, the Court does not hold that, solely by the absence of specific evidence of Depuy's specialized training in or knowledge of infectious diseases, Depuy is inherently unqualified to offer some expert testimony in this case.

is an 'inappropriate response' to a summary judgment motion, and factual assertions made in such letters are 'properly disregarded by the court.'") (quoting *United States v. All Right, Title & Interest in Real Property & Appurtenances*, 77 F.3d 648, 657–58 (2d Cir.1996)). Berk's counsel has informed the Court that no affidavit confirming the opinions Depuy reached in the expert report will be forthcoming, and the opinions were not tested or reaffirmed at Depuy's deposition, at which Depuy appeared as a fact witness. (*See* Depuy Dep. at 4 ("We will only be asking you questions about your relationship with Mr. Berk in terms of a treating physician.").)

■ Even if the expert report were admissible or were confirmed by admissible evidence, it would not satisfy the requirements of *Daubert*. As Berk's counsel acknowledges, Depuy's expert report is not based on Berk's own sworn testimony concerning his conversation with Feldman; in fact, Depuy admitted at his deposition that he had never seen or reviewed Berk's deposition testimony, or the testimony of other parties and witnesses in this case, before developing his expert opinion.[25] Rather, Depuy's expert report is premised on the hybrid view of the facts put forward by Berk for purposes of summary judgment, as well as an additional symptom—redness—that is based on neither party's evidence. As discussed above, neither Berk nor Carmona testified that Berk complained of redness, swelling, and drainage together; Berk states that he complained to Feldman only of orange drain-

age, while Carmona states that she noted his complaints of pain and possibly swelling, but not redness or drainage.

The Court concludes "that there is simply too great an analytical gap between the data and the opinion proffered" by Depuy in his expert report for his conclusion that Feldman committed medical malpractice to be admissible on Defendants' motions. *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Depuy's report contains no expert opinion concluding that, based on Berk's or Defendants' versions of events, Feldman committed medical malpractice. Moreover, the Court cannot fairly infer from Depuy's report alone that even if Berk had complained of only orange discharge when he contacted Feldman, Feldman would still have been required to direct Berk to seek immediate further medical attention. Consequently, the information contained in Depuy's expert report must be excluded. *See Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 269 (2d Cir.2002) ("Because [the expert's] opinion rested on a faulty assumption due to his failure to apply his stated methodology 'reliably to the facts of the case,' Fed.R.Evid. 702, [his] expert opinion ... was not based on 'good grounds.' *In re Paoli [R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994) ]."); *Macaluso v. Herman Miller, Inc.*, No. 01 Civ. 11496, 2005 WL 563169, at *8 (S.D.N.Y. Mar. 10, 2005) (concluding that an expert's testimony must be excluded under *Daubert* "because it is based on incorrect factual assumptions that render all of his subsequent conclusions purely speculative").[26]

25. Depuy's expert report is dated August 18, 2004, while his deposition was held on October 27, 2004. During his deposition, Depuy stated that he had received a transcript of Feldman's deposition only "late last week," even though Feldman's deposition was taken on March 3, 2004, and that he had neither received nor reviewed any other deposition

transcripts related to the case. (Depuy Dep. at 16.) Therefore, it is clear that Depuy had not reviewed any deposition testimony related to the case when he developed his expert report.

26. Even if the portion of Depuy's expert report concluding that Feldman committed

■ Berk, in the alternative, also relies somewhat halfheartedly on a brief colloquy at Depuy's deposition, during which Depuy indicated that he believed any discharge of synovial fluid from a post-operative wound presented a symptom of infection requiring further medical attention. The entire colloquy proceeded as follows:

Q: You do a lot of arthroscopic surgery, do you not?

A: Yes.

Q: Do patients have synovial fluid from time to time draining from their knee?

A: I've never seen it. That's over 2,000 arthroscopies. I've never seen it post-op. If I did see it, it's indicative of infection, period.

. . . . .

Q: You've never seen anyone oozing from their knee at any time after your surgeries?

A: No. If there is any oozing, that's a cause for concern. There should not be. There should not be. Because that kind of—you've got to jump on it.

(Depuy Dep. at 52–53.) No further discussion of, or support for, Depuy's conclusory opinion was provided during his deposition, in his expert report, or in any other papers submitted by Depuy or Berk in opposition to the instant motions. Although the implication of the conclusion is apparent, Depuy never actually states that the failure to direct immediate treatment for any post-operative "oozing" of synovial fluid from a patient's knee would necessarily constitute medical malpractice.

Depuy's conclusion, which appears to be based on no scientific support other than his own personal experience of not having encountered instances of fluid draining from knees of patients on whom he has operated, bears none of the hallmarks of reliability necessary for it to be considered admissible under *Daubert* and Rule 702. As *Colon* noted, of the basic four criteria on which a *Daubert* reliability analysis typically rests, two are particularly relevant in cases in which the expert testimony is based on personal experience: the rate of error of the experience-based *methodology* and "whether such a method is generally accepted in the scientific community." *Colon*, 199 F.Supp.2d at 69–70 (internal citations omitted). An anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the relevant professional community. While the *Daubert* standard does not require that every detail of expert testimony be supported by academic literature, it does mandate that "conclusions [be] supported by good grounds for each step in the analysis." *In re Paoli*, 35 F.3d at 745.

Unlike the experience-based medical expert in *McCullock*, who applied a methodology termed "differential etiology," 61 F.3d at 1044, as well as various scientific and medical treatises, to rule out causes of the plaintiff's illnesses other than ones traceable to the defendants in that case,

medical malpractice was deemed admissible, it would not be sufficient to defeat Defendants' summary judgment motions because Depuy's opinion would still be inapposite to the facts of this case as they relate to the applicable standard of care. It would simply tend to prove that an orthopedic surgeon who does not direct a patient complaining of redness, swelling, and orange drainage to seek further medical attention would commit medical malpractice. It does not tend to prove that a doctor who hears a patient complain only of orange drainage—what Berk testified he reported to Feldman—would commit medical malpractice if the physician does not direct the patient to seek further medical attention.

Depuy's conclusions are not based on "good grounds for each step of the analysis." Rather, they rely on nothing other than "the *ipse dixit* of the expert," *General Electric Co.*, 522 U.S. at 146, 118 S.Ct. 512, declaring that any drainage of synovial fluid from a surgical wound necessarily manifests infection and requires immediate medical attention, to determine that even if Berk's version of events were true, Feldman departed from the applicable standards of care when he allegedly failed to advise Berk to seek immediate medical attention for his knee. He presents no generally accepted scientific methodology, no germane medical literature, and no other evidence that would withstand adversarial scrutiny in support of his categorical statement that any synovial drainage from a post-operative knee in and of itself indicates the presence of infection.

■ Defendants have introduced expert testimony indicating that this *ipse dixit* statement is without scientific basis, as the effusion of synovial fluid alone is not infectious and thus does not require immediate medical attention. *See supra.* As stated above, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Electric Co.*, 522 U.S. at 146, 118 S.Ct. 512. Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. The Court concludes that such exclusion is warranted with respect to Depuy's conclusory deposition testimony.

Several additional factors support the Court's conclusion that Depuy's proffered testimony lacks sufficient reliability to be considered on summary judgment. First, Depuy's report, deposition testimony, and subsequent statements to Berk's counsel indicate that Depuy was not adequately prepared with relevant facts to offer an informed expert opinion concerning whether Feldman departed from the applicable standard of practice on January 25, 2002. As Defendants point out, his expert report and deposition testimony reflect "that he had not been prepared properly for this case." (Crawford Aff. at 2.) Depuy's expert report not only contains several factual errors, including an inaccurate statement concerning the number of days after surgery that Berk contacted Feldman's office, but the report and Depuy's deposition testimony also are both uninformed by Depuy's review of other factual materials critical to Berk's case. At his deposition, for example, Depuy conceded that he had never received or reviewed Berk's own deposition, or the testimony of several other witnesses, before formulating his expert opinion that Feldman committed medical malpractice. (*See* Depuy Dep. at 16.) An expert concededly ill-prepared, and thus an expert opinion inadequately informed about the factual grounding of the subject it is called to address, bears none of the hallmarks of reliability necessary for the opinion to be admissible under *Daubert.*

Second, Berk has done nothing to buttress the opinions reached by Depuy after their admissibility was challenged by Defendants. Berk neither sought nor obtained any expert advice, medical literature, or any other evidence supporting Depuy's opinion. Berk has also done nothing to give the Court confidence that Depuy's opinion should be deemed reliable: he stated at oral argument that he assumed that any future examination of Depuy by the Court "would go very, very badly" (Hr'g Tr. at 14); he failed to attach Depuy's Curriculum Vitae or other materials to his papers opposing summary judgment; and he has expressed his de-

sire to replace Depuy as a witness as soon as the motions are adjudicated.[27]

Because the Court concludes that Depuy's testimony is not "the product of reliable principles and methods," and that Depuy has not "applied the principles and methods reliably to the facts of the case," Fed.R.Evid. 702, the Court finds that Depuy's proposed testimony is inadmissible to defeat Defendants' summary judgment motion.

### 5. *Defendants are Entitled to Summary Judgment*

■ Considering the admissible materials in the light most favorable to Berk, *see Colon*, 199 F.Supp.2d at 68, the Court concludes that Berk has failed to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Without the testimony excluded by the Court, Berk's medical malpractice claim cannot survive Defendants' summary judgment motions. *See, e.g., Fridovich v. David*, 188 A.D.2d 984, 591 N.Y.S.2d 885 (3d Dep't 1992) (concluding that in the absence of expert testimony demonstrating that a defendant's alleged deviation from the standard of care was the proximate cause of the plaintiff's injuries, defendant was entitled to summary judgment).[28] Ellen Berk's loss of consortium claim, which is derivative of Berk's malpractice claim, must also fail. *See Wittrock v. Maimonides Medical Center–Maimonides Hosp.*, 119 A.D.2d 748, 501 N.Y.S.2d 684, 685 (2d Dep't 1986). Berk has abandoned his informed consent claim. Consequently, Defendants are entitled to summary judg-ment on all claims brought against them in this action.

### III. *ORDER*

For the reasons discussed above, it is hereby:

**ORDERED** that the motions for summary judgment of Defendants Andrew Feldman, M.D., and University Place Orthopedics are hereby GRANTED.

The Clerk of Court is directed to close this case, and all open motions [docket nos. 24 and 27].

**SO ORDERED.**

---

**27.** Even if Depuy's own recalcitrance is partly to blame for Berk's failure to provide support for his opinion, Berk's counsel may also have contributed to this turn of events. It appears that Depuy attributes his refusal to provide additional support to Berk's case at least in part to Berk's counsel's failure to prepare him properly for the case.

**28.** Because the Court has concluded that Defendants are entitled to summary judgment for the reasons discussed above, it does not decide whether Depuy was required to comply with Fed.R.Civ.P. 26(a)(2)(B), and if so, whether his failure to do so should serve as additional or alternative grounds to exclude his expert report.